GALIGHER *v.* JONES.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF UTAH.

No. 75. Submitted November 14, 1888.—Decided January 21, 1889.

A stock-broker received orders by telegraph from his principal to sell certain securities belonging to the principal in his hands and invest the proceeds in certain other securities, named in the order, at a fixed limit. When the telegram arrived the order might have been executed that day, and the securities ordered could have been bought within the limit. The principal was in the habit of dealing with the agent in that way, the agent executing the orders, making advances when necessary and charging the principal with commissions and interest. At the time when this order was received the principal was indebted to the agent for advances, commissions and interest about $4000 more than the value of the securities in his hands: The broker did not execute the order, did not notify the principal by telegraph that he declined to do so, and made no demand for further advances; but notified him of his refusal by a letter written on the day when the order was received, but received by the principal

two days later. The securities which had been ordered sold depreciated below the prices at which they could have been sold on that day, and those which had been ordered bought advanced, so that they could have been sold at a large profit. The broker sued the principal for advances on an open account current and interest and commissions. The principal set up as a counterclaim the losses from these sources: *Held,*

  (1) That the broker was bound to follow the directions of his principal or give notice that he declined to continue the agency;

  (2) That this notice should have been given by telegraph, and that the delay caused by using the mail alone was inexcusable under the circumstances;

  (3) That in the absence of a special agreement to the contrary, it was the principal's judgment, and not the broker's, that was to control;

  (4) That the broker was liable for all the damages which the principal sustained by the refusal to change the stock, both on the stocks ordered sold, and those ordered purchased.

The measure of damages in stock transactions between a stock-broker and his principal, in which the principal suffers from the neglect of the broker to execute orders either for the sale of stock which he holds for the principal, or for the purchase of stock which the principal orders, is — not the highest intermediate value up to the time of trial — but the highest intermediate value between the time of the conversion and a reasonable time after the owner has received notice of it: in this respect disregarding the rule adopted in England and in several of the States in this country, and following the more recent rulings in the Court of Appeals of the State of New York.

THE case is stated in the opinion.

*Mr. John R. McBride* for appellant.

*Mr. C. W. Bennett* for appellee.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is a suit brought by Jones, a stock-broker, against his customer, for the balance of account alleged to be due to the plaintiff arising out of advances of money and purchases and sales made, and commissions. The complaint, or declaration, states "that between the 15th day of January, 1877, and 15th day of January, 1879, the plaintiff, as a stock-broker, at the special instance and request of the defendant, paid and advanced on an open account current, to and for the use of the defendant, divers sums of money, and also earned

at the defendant's request, and became entitled to, divers commissions as a broker, for all of which monthly accounts were rendered and balances struck, and, by agreement, interest charged monthly on balances; and that on the first day of March, 1879, there was due and unpaid from defendant to plaintiff the sum of $6232.30 no part of which has been paid." Judgment is demanded for this sum, with interest and costs.

Galigher, the defendant below, in his answer, after denying any indebtedness to the plaintiff, states that the plaintiff is a banker at Salt Lake City, and that the defendant has had for two years past an account with him as such, and that " the plaintiff, at the defendant's request, and as his agent, bought or caused to be bought at the Mining Stock Exchange Board, in San Francisco, California, certain mining stocks, for and on account of this defendant, and at various times thereafter in the years 1877 and 1878, on the order and at the direction of this defendant, and as his agent aforesaid, bought and sold mining and other stocks up to about the date of the complaint; that at divers times during and between the dates above specified this defendant paid into said plaintiff's bank sums of money on account of said purchases, and to the credit thereof, and which was so applied by plaintiff on defendant's order.

" And defendant denies that at the date of the complaint the sum of five thousand dollars, or any sum, was due the plaintiff on said account, or on any account, for loans or advances from plaintiff to defendant. Defendant further alleges that it was distinctly agreed between the plaintiff and this defendant in the business that said purchases of stock by the plaintiff were made on defendant's credit, and that said stocks were bought and were to be held subject to defendant's order at all times, this defendant agreeing to pay said plaintiff commissions for his services as agent and an agreed rate of interest on any advances he might make, and at no time had the plaintiff any authority to either buy or sell stocks on defendant's account, except by his order."

The defendant then set up the following counterclaims, to wit: 1. That on the 13th day of November, 1878, being at

Virginia City, he ordered the plaintiff (at Salt Lake City), by telegraphic despatch, to sell certain mining stocks then in his hands as defendant's agent, to wit: 320 shares of "Justice" stock, worth $9 per share; 50 shares of "Alta" stock, worth $8 per share; 200 shares of "Tip Top" stock, worth $1.60 per share, and to invest the proceeds in "North Bonanza" stock, another mining stock on the same board which the defendant had been investigating; that the plaintiff received this despatch in ample time to make the transaction, as directed, on that day, but refused and neglected to do so; and that the defendant relied on its being done, and agreed with another party to sell the stock he had ordered purchased; that the plaintiff did not give notice to the defendant of his refusal to comply with said order until several days afterwards, and then by letter; that afterwards, and without any orders so to do, the plaintiff sold the "Alta" stock at $7.75 per share; the "Justice" at $4.40 per share; and the "Tip Top" at $1.25 per share, making a net loss to defendant of $1200; and that the "North Bonanza" stock was not worth more than $2 per share on that day, and within five days thereafter it advanced to $5.60 per share, which the defendant would have realized if the plaintiff had complied with his order, — whereby the defendant lost the sum of $6125.

2. The defendant further alleged, that in the same month of November, 1878, the plaintiff, as defendant's agent, held for him 600 shares of mining stock known as "Challenge" stock; and without his consent, on the 27th and 29th of said November, sold the same for his, the plaintiff's, own use, to the damage of the defendant of $2850.

3. That on the 22d day of November, 1877, the plaintiff held for the defendant, as his agent, as aforesaid, fifty shares of mining stock known as "Ophir" stock, worth at that date $37.50 per share, and on that day pretended to defendant that he had sold said stock for defendant, and so reported to him, when in fact he had not sold said stock, but continued to hold the same, and afterwards sold it for $100 per share, the advance amounting to $3125, which is justly due from the plaintiff to the defendant.

The case being at issue, was tried by a jury and resulted in a verdict of $5412.50 for the defendant. This verdict was set aside, and a new trial awarded, and the case was next tried by a referee appointed by the court. He duly reported his findings of fact and law, upon which the court gave judgment for the plaintiff for the sum of $7028. The substance of the findings of fact was: That the plaintiff was a banker in Salt Lake City; that during the years 1878 and 1879 he bought and sold mining stocks for the defendant upon defendant's order and request, and made the advances necessary for the purchases, and was to receive commissions on the purchases and sales, and interest on the advances; and to hold the stocks purchased for defendant in his own name as collateral security for any balance due to him. With regard to the first defence set up by the defendant, the referee found, that on the 13th of November, 1878, the plaintiff held of stocks purchased for defendant, amongst others, 320 shares of "Justice," then worth $9 per share; 50 of "Alta," worth $18 per share; and 200 of "Tip Top," worth $1.60 per share; and that on that day the defendant, being at Virginia City, ordered plaintiff by telegram to turn his said stocks without limit into "North Bonanza" at limit of $2.75; that the plaintiff received said telegram at Salt Lake City on the same day in time to have sold the stocks ordered sold, and to have purchased the "North Bonanza," which was then selling for $2 and $2.50 per share; that the plaintiff failed and refused to obey the directions given in the telegram, and failed to notify the defendant of his refusal until the 15th of November, when he notified him by letter written on the 13th and received by defendant on the 15th; that within a few days the price of "North Bonanza" advanced to $5 and $5.50 per share, having reached $3.50 on the 16th of November, and before the 23d receded to a point below what it was on the 13th. The defendant at the time of sending his telegram to the plaintiff was owing him more than $4000 for advances, commissions and interest, over and above the market value of the stocks then held by him for the defendant. As a conclusion of law, and under the decision of the Supreme Court of the Territory, given upon setting

aside the verdict rendered on the first trial, the referee dis-
allowed this counterclaim, holding, in conformity with . the
view of the court, that the plaintiff was not bound to comply
with the defendant's directions about the stock, and not bound
to give him any prompter notice than he did give. The court,
in its opinion, as quoted by the referee in his report, had said:
" Was the plaintiff under obligation to sell the stock and invest
the proceeds of such sale as directed by the defendant? . . .
This order in effect directed the plaintiff to dispose of certain
securities held by him and to take another in place of them.
. . . I do not, in the examination of the record and testimony,
find any contract or understanding between the parties requir-
ing the plaintiff to do it. The order to sell and reinvest being
one, the plaintiff was not obliged to comply with it. The
difference between the values of the stocks at the time the
order was made and at the time they were afterwards sold is
immaterial in this action. The right of the plaintiff to sell at
the time of sale and the good faith and sound discretion in
which it was made are not in issue. I am, therefore, of the
opinion that the verdict allowing damages for the failure of
plaintiff to sell the Justice, Alta, and Tip-Top mining stocks,
as directed by the defendant on November 13th, 1878, is not
supported by evidence rightly before the jury, and that there
was error in admitting evidence as to the value of the stock of
the North Bonanza in support of the item of counterclaim,
based upon the failure of the plaintiff to comply with the
order to purchase."

In this we think the court was in error. A broker is but an
agent, and is bound to follow the directions of his principal,
or give notice that he declines to continue the agency. In the
absence of a special agreement to the contrary it is the princi-
pal's judgment, and not his, that is to control in the purchase
and sale of stocks. The latter did not ask for any further
advances by the order in question; he only directed a conver-
sion, or change of one stock into another. The plaintiff should
have given prompt notice that he objected and declined to
make the change. Telegraphic communication was used by
the defendant, and no reason appears why the plaintiff could

not have used the same. The delay caused by using the mail alone was inexcusable under the circumstances. The plaintiff charged ample compensation for his services, and was bound to act faithfully, fairly and promptly. We think that he was liable for all the damages which the defendant sustained by his refusal to change the stocks, both for the loss on the sales of the "Justice," "Alta" and "Tip-Top" and the loss occasioned by not purchasing the "North Bonanza." The report of the referee, being made in conformity with the decision of the Supreme Court, does not show sufficient facts to determine the amount of loss in these respects. If the answer states the facts truly, the loss on the failure to sell the old stocks was over $2000 ; and it appears from the report that the "North Bonanza" could have been purchased at $2 to $2.50 per share on the 13th of November, and sold for $5 to $5.50 within a few days, — showing a loss of $3 per share; and as the proceeds of the other stocks, if they had been sold, as directed, would have been sufficient to purchase 1600 to 2000 shares of "North Bonanza," the loss on this account must have been more than $5000. But the want of a sufficient finding of facts necessitates a new trial.

As to the second item of counterclaim set up in the answer, namely, the alleged wrongful sale by the plaintiff of 600 shares of "Challenge" stock, the referee found that the plaintiff held such stock for the defendant, and on the 27th and 29th of November, 1878, of his own motion, and without notice to the defendant, sold it for $1.25 per share ; that in December the stock sold as high as $2 per share; in January the highest price was $3.10 ; in February, the highest price was $5.50. The referee allowed the defendant the highest price in January, namely, $3.10 per share, being an advance of $1.85 above what the plaintiff sold the stock for, which, for the whole 600 shares, amounted to $1110. The reason assigned by the referee for not allowing the defendant the highest price in February, (namely, $5.50 per share,) was that before that time the defendant had reasonable time, after receiving notice of the sale of his stock by the plaintiff, to replace it by the purchase of new stock, if he desired so to do ; and he allowed him the

highest price which the stock reached within that reasonable time.   In this conclusion we think the referee was correct, and as to this item we see no error in the result.

With respect to the third counterclaim set up in the answer, the referee found that the plaintiff did sell the fifty shares of "Ophir" stock mentioned therein, on the 22d day of November, 1877, as reported by him to the defendant.   Consequently, the referee correctly found that the defendant was not entitled to any damages on that account, as no dissatisfaction with the sale was expressed by the defendant at the time.   We see no error in this conclusion.

It has been assumed, in the consideration of the case, that the measure of damages in stock transactions of this kind is the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter, to be allowed to the party injured to place himself in the position he would have been in had not his rights been violated.   This rule is most frequently exemplified in the wrongful conversion by one person of stocks belonging to another.   To allow merely their value at the time of conversion would, in most cases, afford a very inadequate remedy, and, in the case of a broker, holding the stocks of his principal, it would afford no remedy at all.   The effect would be to give to the broker the control of the stock, subject only to nominal damages.   The real injury sustained by the principal consists not merely in the assumption of control over the stock, but in the sale of it at an unfavorable time, and for an unfavorable price.   Other goods wrongfully converted are generally supposed to have a fixed market value at which they can be replaced at any time; and hence, with regard to them, the ordinary measure of damages is their value at the time of conversion, or, in case of sale and purchase, at the time fixed for their delivery.   But the application of this rule to stocks would, as before said, be very inadequate and unjust.

The rule of highest intermediate value as applied to stock transactions has been adopted in England and in several of the States in this country; whilst in some others it has not obtained.   The form and extent of the rule have been the sub-

ject of much discussion and conflict of opinion. The cases will be found collected in Sedgwick on the Measure of Damages, [479,] vol. 2, 7th ed. 379, note (b); Bayne on Damages, 83, (92 Law Lib.); 1 Smith's Lead. Cas. (7 Amer. ed.) 367. The English cases usually referred to are *Cud* v. *Rutter*, 1 P. Wms. 572, 4th ed. [London, 1777] note (3); *Owen* v. *Routh*, 14 C. B. 327; *Loder* v. *Kekulé*, 3 C. B. (N. S.) 128; *France* v. *Gaudet*, L. R. 6 Q. B. 199. It is laid down in these cases that where there has been a loan of stock and a breach of the agreement to replace it, the measure of damages will be the value of the stock at its highest price on or before the day of trial.

The same rule was approved by the Supreme Court of Pennsylvania in *Bank of Montgomery* v. *Reese*, 26 Penn. St. (2 Casey,) 143, and *Musgrave* v. *Beckendorff*, 53 Penn. St. (3 P. F. Smith) 310. But it has been restricted in that State to cases in which a trust relation exists between the parties, — a relation which would probably be deemed to exist between a stock-broker and his client. See *Wilson* v. *Whitaker*, 49 Penn. St. (13 Wright) 114; *Huntingdon R. R. Co.* v. *English*, 86 Penn. St. 247.

Perhaps more transactions of this kind arise in the State of New York than in all other parts of the country. The rule of highest intermediate value up to the time of trial formerly prevailed in that State, and may be found laid down in *Romaine* v. *Van Allen*, 26 N. Y. 309, and *Markham* v. *Jaudon*, 41 N. Y. 235, and other cases, — although the rigid application of the rule was deprecated by the New York Superior Court in an able opinion by Judge Duer, in *Suydam* v. *Jenkins*, 3 Sandford (N. Y.) 614. The hardship which arose from estimating the damages by the highest price up to the time of trial, which might be years after the transaction occurred, was often so great, that the Court of Appeals of New York was constrained to introduce a material modification in the form of the rule, and to hold the true and just measure of damages in these cases to be, the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock. This modification of the rule was

very ably enforced in an opinion of the Court of Appeals delivered by Judge Rapallo, in the case of *Baker* v. *Drake*, 53 N. Y. 211, which was subsequently followed in the same case in 66 N. Y. 518, and in *Gruman* v. *Smith*, 81 N. Y. 25; *Colt* v. *Owens*, 90 N. Y. 368; and *Wright* v. *Bank of Metropolis*, 110 N. Y. 237.

It would be a herculean task to review all the various and conflicting opinions that have been delivered on this subject. On the whole it seems to us that the New York rule, as finally settled by the Court of Appeals, has the most reasons in its favor, and we adopt it as a correct view of the law.

*The judgment is reversed, and the cause remanded to the Supreme Court of Utah, with instructions to enter judgment in conformity with this opinion.*