Bushnell v. Curtis, 236 Ill. App. 89.

# W. E. Bushnell, Appellee, v. Allen Curtis et al., trading as Curtis & Sanger, Appellants.

## Gen. No. 29,365.

**1. CONTRACTS**—*when acceptance to complete contract implied.* Where plaintiff instructed defendants, as brokers, that if the opportunity offered they should purchase for him 250 to 275 shares of a certain stock "on scale downward from $193" and defendants replied that "we will put an order in for 100 shares at $193 and will see how the market acts," the law will, even if defendants' statement be considered as a counter proposal to purchase 100 shares, imply an acceptance thereof by plaintiff, it being shown that the phrase "on scale downward" had a well-defined meaning that the broker should purchase stock in blocks of 100 shares at the price named or less according to the market, and the court was warranted in finding that there was a contract by defendants to purchase 100 shares of stock for plaintiff at the price named.

**2. EVIDENCE**—*admissibility of trade journals and sheets to show market price.* In an action against stock brokers for the loss sustained by plaintiff because of defendants' failure to purchase certain stock for plaintiff as they had agreed to do, the court properly admitted in evidence certain trade sheets and journals to show the price for which the stock could have been purchased at the time in question.

**3. EVIDENCE**—*admissibility of market reports and trade journal to show market value.* The market reports of the New York Stock Exchange and the Commercial and Financial Chronicle, a trade publication, were properly admitted in evidence to establish the market value of corporate stock involved in the suit, the evidence being undisputed that such sheets and the publication are recognized in the trade as being correct and are relied upon as showing correctly the bids, offers and consummated sales of corporate stocks.

**4. EVIDENCE**—*sufficiency of foundation evidence for admission of market reports and trade journals.* Testimony by a witness that he was a stock broker and had been in business for over 27 years, was acquainted with the trade reports, sheets and journals as used among stock brokers and persons trading in stocks, was a sufficient foundation for the introduction in evidence, to prove the market value of certain stock at a particular period, of stock exchange sheets and a financial publication though he received the market sheets only as a subscriber, not having personal knowledge of the precise manner in which the particular sheets were made

up, where he did, however, testify in a general way as to how the sheets were made up as he had learned from observation during his years of experience in the brokerage business.

5. DAMAGES—*measure for breach of broker's contract to buy corporate stocks for customer.* In an action of assumpsit against brokers for damages sustained by reason of defendants' failure to purchase certain corporate stock at the price ordered by plaintiff, it appearing that plaintiff was in a distant State at the time, the court properly allowed as damages the difference in price between the stock at the time defendants should have purchased it and when plaintiff first learned of their failure to do so, together with the amount of a script dividend which he would have received had the stock been purchased as ordered.

Appeal by defendants from the Circuit Court of Cook county; the Hon. HARRY M. FISHER, Judge, presiding. Heard in the first division of this court for the first district at the March term, 1924. Affirmed. Opinion filed January 26, 1925.

TAYLOR, MILLER, DICKINSON & SMITH, for appellants.

McCULLOCH & McCULLOCH, for appellee; GROVER C. McLAREN, of counsel.

MR. JUSTICE MATCHETT delivered the opinion of the court.

The defendants below appeal from a judgment in the sum of $1,087.50, entered upon the finding of the court. The material facts are not in controversy.

The defendants are stock brokers and plaintiff, at the time of the transactions out of which this controversy arises, was their customer. Plaintiff was the owner of 355 shares of the common stock of the American Tobacco Company. He decided to sell 250 shares of this stock at the then market price and invest the proceeds thereof in United States bonds, usually described as the "Fourth Liberty Issue." His thought was that he would thereafter sell these bonds and with the proceeds of the same repurchase the stock of the tobacco company upon a favorable market, thus realizing a profit out of the transaction.

Through orders given to defendants as his brokers the stock was sold and the Liberty bonds purchased.

While plaintiff's residence was in Chicago, he about this time contemplated a trip through Florida, which would take him out of touch with the markets, and he called at the defendants' offices and explained the situation to a member of their firm. Thereafter, on January 27, 1919, at Tallahassee, Florida, he wrote defendants as follows:

"If opportunity again offers please buy 250 to 260 common shares of American Tobacco Co. on scale downward from $193 before February 14th when dividend is off, selling afterwards the 4th liberty bonds to pay out the cost of tobacco. The profit together with dividend will make the transaction worth while."

To this letter defendants replied on January 29, 1919:

"We acknowledge receipt of your favor of the 27th, written from Tallahassee, Florida, in which you state that you believe it would be a good idea to buy 250 or 260 shares of American Tobacco common stock on a scale downward from $193.00 a share before February 14th. We believe this would be a good idea, and we will put an order in for one hundred (100) shares at $193.00 and will see how the market acts.

"The only objection we can have to your selling Fourth Liberty Loan Bonds which you purchased recently is the fact that they are up against $40,000 worth of your notes maturing in April, and while the banks that are holding these notes are good friends of ours, they object strongly to this change of collateral.

"It might be that if you could arrange a satisfactory margin we could leave the American Tobacco stock here and still keep the Liberty bonds against the loans outstanding which mature in April and May. In any event, we will keep you more or less posted on American Tobacco stock in the near future.

"With kindest regards, and hoping that you are enjoying yourself, we remain,"

The plaintiff did not have a Chicago office and by his direction mail from defendant was sent to his home in Chicago, where his sister and a niece lived, who had instructions to forward the mail to Florida. He received defendants' letter of January 29 on February 5, and thereafter was out of communication for two weeks and did not hear further from defendants until after February 15. As a matter of fact defendants placed an order for 100 shares at $193 a share. The matter was, however, intrusted to an employee, who was without experience in such transactions, and he, probably with the best of motives, reduced the price to $191 a share. The market price did not reach that point, and it was therefore impossible to make the purchase at that price; but we think that evidence which will hereafter be discussed shows without much doubt that there was ample opportunity to have purchased the 100 shares at $193 a share, and that this transaction would have been consummated had the price offered not been reduced.

When plaintiff first learned that the stock had not been purchased, the price had advanced on the market to $199 a share. In the meantime also (as he had anticipated and as defendants knew would happen) a script dividend of 5 per cent had been paid. The court found the plaintiff's damages to be $6 a share on the stock and $5 a share or $500 on account of the dividend, from which was deducted the brokerage charges of $12.50, leaving a net sum of the amount for which judgment was entered.

The defendants contend that this judgment is against the law and the evidence, and that the court erred in thus finding the issues for the plaintiff. They argue that the evidence fails to show the plaintiff's request that defendants should act as his broker met with such an acceptance as would constitute a meeting of the minds of the parties and result in a contract. On the contrary, it is contended that there was only

a tentative partial acceptance, which was really in the nature of a counter offer which defendants might withdraw at any time before its communication to the plaintiff, and this, it is argued, they did with the result that there was no meeting of the minds and therefore no contractual liability. On this point the defendants cite *Bernard v. Maury & Co.,* 20 Grat. (Va.) 434, a case, we think, which is easily distinguished; and sections 64, 65, 70, 72, 73 and 77 of Williston on Contracts, where the elementary propositions with reference to the necessity of an unconditional acceptance of an offer, in order to constitute a valid and binding contract, are set forth.

The testimony indicates that the phrase "on scale downward" had a well-defined meaning on the exchange, which was that the broker should buy 100 shares at the price named or, as plaintiff explained, "from 193 that would be the top and to purchase on a scale downward would be to take advantage of the market as it went, whether a fractional part of a point or a point, or if it was a demoralized market, it might be five points at a jump and a fair man before the blackboard and ticker should use ordinary judgment and know how far to dip in each block of stock. If no limit was placed on them they would buy at whatever the market was; it would have been safe to have purchased at 193, 192½, 192, anywhere along there." The entire correspondence of the parties which is in evidence indicates that both construed defendants' letter of January 29, 1919, as an unconditional acceptance of plaintiff's order of January 27 for 100 shares at least. This is indicated by defendants' statement, "We will put an order in for 100 shares at $193 and will see how the market acts." It is further indicated by their letter of February 10, 1919, where, replying to plaintiff's letter of February 5, they state: "Will say that we have an order in to buy 100 shares American Tobacco for your account

at 193.'' Even if defendants' reply of January 29 should be construed as a counter proposal rather than an unconditional acceptance, we think, under the facts as they appear in the correspondence, the law would imply an acceptance by plaintiff of the counter proposal to order 100 shares at 193. A contract cannot bind one party without binding the other. If defendants had, as they said they would, purchased 100 shares at $193, could there be any doubt, under the facts as they appear in this record, that defendants would have been entitled to their commission for making the purchase? We do not think so.

The courts do not often put a construction upon a contract other and different from the construction placed upon the same contract by the parties themselves when litigation was not pending. We think, therefore, the court was justified in finding that there was an agreement between the parties whereby defendants were to purchase for plaintiff's account 100 shares of American Tobacco at $193.

It is next contended that the court erred in admitting in evidence certain trade sheets and journals which were introduced for the purpose of showing that, between January 29 and February 14, 1919, American Tobacco common stock was bought and sold on the New York Stock Exchange at $193 a share or less. The defendants contend that, in order to make this proof, it was necessary to prove these facts by parties who were conversant with the sales and that while proof of market values by means of quotation sheets may be proper in an action in *trover* for conversion, such proof is inadmissible in an action in assumpsit. *Burns v. Shoemaker,* 172 Ill. App. 290, is cited by defendants but is, we think, far from the point. It was there held that the owner of converted property may either sue in tort for conversion and recover the value of it, or that, waiving the tort, he may sue in assumpsit for money had and received.

In the latter case, of course, the question of market value would be immaterial for the reason that the plaintiff so electing sues for the money which the converter has received rather than for the value of the property which he has converted. The action in that case was in trover for conversion and the Appellate Court held that the trial court erred in not allowing a proffered witness to testify as to the market value of the stock; but this is very far from holding that other competent evidence would not have been admissible in order to establish the fact.

In the instant case, for the purpose of establishing market value, the market reports of the New York Stock Exchange and the Commercial and Financial Chronicle, a trade publication, were admitted in evidence.

Concerning the admissibility of such evidence, Chamberlayne on Evidence, vol. 3, sec. 2099c, states:

"The relevancy to the fact of value of market reports and other trade publications is part of the modern law of evidence. That law, rationally adapting itself to changes in the business world, is sensitive to variations in the proper classification of evidence into primary, secondary, best and substitutional. The time undoubtedly was when the primary evidence as to the fact of market value would have been the personal testimony of a witness who had been to the market town and learned the fact. Under these conditions, hearsay might well have been rejected as secondary evidence. Methods of transacting business have radically changed. At the present day, the primary, most satisfactory, evidence of market value is the trade report in its various forms."

The evidence with reference to these stock exchange sheets and this publication was to the effect (and it is undisputed) that they are recognized in the trade as being correct and are relied upon by the trade as showing correctly the bids and offers and consummated sales, have been used a great many years and

are generally accepted in the trade; that the Commercial and Financial Chronicle is regarded as exceedingly reliable and is held in such high estimation that it is bound and kept on file by brokers. Presumably it is kept on file by these defendants; at least in the face of such testimony they did not see fit to take the stand to deny the reliability of these reports or this publication or to say that it was not regarded by them as reliable. In *Sisson v. Cleveland & T. R. Co.*, 14 Mich. 489, Judge Cooley, reviewing the authorities on this subject, said:

"The principle which supports these cases will allow the market reports of such newspapers as the commercial world rely upon, to be given in evidence. As a matter of fact, such reports, which are based upon a general survey of the whole market, and are constantly received and acted upon by dealers, are far more satisfactory and reliable than individual entries or individual sales or inquiries; and courts would justly be the subject of ridicule if they should deliberately shut their eyes to the sources of information which the rest of the world relies upon, and demand evidence of a less certain and satisfactory character."

This and other cases have been cited with approval in this court. (See *Tully v. Western Union Tel. Co.*, 141 Ill. App. 312.) There are some cases such as *Whelan v. Lynch*, 60 N. Y. 469 (where the necessary preliminary evidence was not offered), and it was held error to receive such evidence, but the briefs before us indicate that, with the possible exception of the State of Massachusetts, evidence of this kind is admissible when made competent by the necessary preliminary proof. Defendants cite and rely on *Doherty v. Harris*, 230 Mass. 341, a case where the admissibility of such evidence was perhaps not the controlling question, and in which it would appear that an earlier case (*Whitney v. Thacher*, 117 Mass. 523), holding differently, was not called to the attention of the

Bushnell v. Curtis, 236 Ill. App. 89.

court. We do not hesitate to hold that the trial court did not err in this respect. (See *Nash v. Classen*, 163 Ill. 409.)

The defendants, however, further contend that, conceding that such evidence is admissible, the proper foundation was not laid for its introduction. The evidence tending to lay such foundation was given by Walter S. Brewster, a witness for the plaintiff, who testified that he was a stock broker and had been in business over 27 years, was acquainted with trade reports, sheets and journals as used among stock brokers and persons trading in stocks. The defendants objected to Mr. Brewster's testimony because it appeared that he received the market sheets only as a subscriber, he not having, as the cross-examination showed, personal knowledge of the precise manner in which the particular sheets were made up. He did, however, testify in a general way that, when a sale was made on the floor of the New York Stock Exchange, the broker, who made the sale, would make a note of it on a slip of paper and hand it to a reporter on the floor of the Exchange; that the slip was taken on the floor of the Exchange and handed to a reporter, who telegraphs it to the company sending out the quotations over the ticker. These quotations are then telegraphed broadcast over the ticker service and are printed on the tape of the ticker company. The company which gathers these quotations uses that same source of supply for its information and makes up its sheets of quotations from that service. He did not, however, know whether the reports were made from the ticker or from the notes given to the reporter. We think it was not error to permit him to testify in this general way as to information which he had acquired in his business during 27 years of active experience; but however that may be, the fact that the sheets and the paper offered in evidence were generally relied upon in the trade as giving correct

information as to the market value of stocks and the prices at which the same are sold and bought, is controlling.

The defendants attempt to distinguish the line of cases so holding, arguing that it appeared in these cases that the sheets or journals containing such information were relied upon *by the defendants.* We do not think this case is thus distinguishable from those cited, since Mr. Brewster's testimony was to the effect that these reports and this journal were *generally relied upon* by all persons engaged in the business as containing accurate and precise information. There was no attempt by defendants to offer evidence to the contrary, and it would therefore appear, since they were engaged in the business of stock brokers, that this evidence offered was of a kind upon which they themselves relied in conducting their business. We think the preliminary proof was sufficient to justify the court in receiving the financial journal and the report sheets in evidence.

It is finally contended, however, in behalf of the defendants, that the court erred in the assessment of damages, and it is strenuously contended that the court should have held, under the evidence, that plaintiff was not entitled to more than nominal damages. In the assessment of damages the court allowed the sum of $6 a share on the 100 shares of tobacco stock which defendants had failed to purchase as ordered, this being the difference between the price at which they were ordered to buy—namely, $193 a share and $199 a share—to which price the market had advanced when plaintiff finally learned that the defendants had failed to execute his order. To this the court added the amount which the plaintiff would have derived from the receipt of the script dividend declared upon the stock and deducted the amount of the commissions which defendants would have been entitled to receive in case they had executed the order.

In discussing the rule of damages applicable, defendants attempt to distinguish between cases in trover for conversion and actions in assumpsit, but an examination of the cases does not, we think, justify any such distinction. The general rule as to the assessment of damages is that a plaintiff who recovers is entitled to such damages as are the natural and proximate result of the wrong of which he complains, in so far as these damages can be determined, and were in the contemplation of the parties at the time of the transaction; and this general rule obtains whether the action is one in trover or an action in contract for a failure to purchase or deliver property or other default in respect thereto. It was at one time held that, in cases of this kind, the plaintiff might recover the highest market price between the date of conversion or default and the time of trial. It was so held in *Markham v. Jaudon,* 41 N. Y. 235, but the doctrine there laid down was repudiated by the courts of New York in the later case of *Baker v. Drake,* 53 N. Y. 211. That doctrine was also repudiated by the courts of this State in the case of *Sturges v. Keith,* 57 Ill. 452, where it was held, under the particular circumstances there appearing, that, in an action for the conversion of personal property, the proper measure of damages was the market value of the property at the time of the conversion. In *Brewster v. VanLiew,* 119 Ill. 554, a case where stock was purchased by a broker for a customer and carried on margin and subsequently wrongfully converted, the trial court instructed the jury that the plaintiff was entitled, on tendering the balance due, to recover either the stock or the amount of his advances by way of margin, with interest thereon, if delivery of the stock was refused. This instruction was held erroneous, the court saying that the plaintiff was justly entitled to his stock, not to be placed in a better position than if he had the stock, that the compensation which the law gives for the

deprivation of property is the value of the property and never the price which the owner paid for the property. In *Hughes v. Barrell*, 167 Ill. App. 100, the plaintiff sued for an alleged wrongful sale of his stock then in the possession of the defendant as a broker, the trial court ruled that the recovery, if any, should be limited to the difference between the price for which the stock was sold "and the market price within a reasonable time after the plaintiff was informed of said sale, in which time he could have replaced it." And this court said that the measure of damages adopted was correct; that it was the rule adopted in *Baker v. Drake, supra*, modifying the less favorable rule for the defendants as laid down in *Markham v. Jaudon, supra*, and that the same had been approved in *Brewster v. VanLiew*, 119 Ill. 554. The defendants rely upon the case of *Gurley v. MacLennan*, 17 App. Cas. (D. C.) 170, 180. That was a case where the plaintiff gave to his stock broker, who dealt upon the New York Stock Exchange, a verbal order for the purchase of 100 shares of Brooklyn Rapid Transit stock, which was at that time fluctuating and speculative in its value. He deposited a margin of $2,000, for which a receipt was given by the broker. The intentions were evidently to sell again on a rising market, and that a settlement would be made on differences rather than an actual sale consummated. The order was given on March 23, 1899, too late for execution on that date, and on March 23 the stock opened on the exchange at 107¾, and the lowest figure reached on that day was $107.50. It thereafter continued to advance, and on March 29 it reached the price of $136¾ per share and thereafter declined until at the time of the trial the stock was quoted as low as $70 a share.

The question of whether the order to buy was an absolute or conditional one was an issue of fact in the case. On the matter, however, of damages the court,

at the request of the plaintiff, instructed the jury that, if it should find from the evidence that the plaintiff on March 22, 1899, employed the defendants to purchase for him 100 shares of Brooklyn Rapid Transit stock on the New York Stock Exchange at its market value on the morning of the 23rd of March, and deposited with the defendants the sum of $2,000 as a margin or part payment on the stock, and that the defendants neglected to make the purchase, then the plaintiff was entitled to recover the difference between the market value of the stock on March 23, 1899, "and the market value of said stock within such reasonable time in the judgment of the jury after the plaintiff had knowledge that the defendant had not purchased said stock as would have enabled the plaintiff to have purchased the same." This instruction was held erroneous upon the grounds that it assumed without any proof that the intention and desire of the plaintiff to purchase the stock remained for some time after he had been advised of the failure of the defendants to make the purchase for him; that, although the plaintiff never made the purchase himself at any time afterwards, and so far as the record showed had never had any intention to make such purchase, yet the jury were directed under the instruction to allow him such sum of money as would have enabled him to make it if he had wished. This, the court said, was to give the defendant a gratuity instead of compensating him for a loss. And the court said that, while the theory of the suit was that the plaintiff suffered damage by the wrongful acts of the defendants, it was not apparent how there could have been damage in respect to the subsequent purchase when there was no such subsequent purchase, no necessity therefor, and no liability to make any such purchase; that if the plaintiff had been compelled to purchase at the higher figure, or if the defendant actually purchased at such higher figure, a case might be presented that would

have justified the instruction. The court said that the plaintiff would, in any event, only be entitled to nominal damages, but the damages in law could be only such as would directly and naturally result from the wrongful act of the defendants and could have no reference to any possibility of subsequent purchase by the plaintiff. The plaintiff in this case attempts to distinguish the facts in *Gurley v. MacLennan, supra,* from those here appearing, but we doubt whether it is possible to so distinguish it upon any material and controlling fact. The cases cited in that opinion and upon which the court evidently relied, we think, hardly sustain the doctrine as there laid down, and, in so far as that decision holds that it is necessary for a plaintiff in such case to actually make a purchase of the stock upon the market in order to establish his damages, we think it is contrary to reason and to the best authorities. Thus in *Ling v. Malcom,* 77 Conn. 517-26, the court said:

"To enable a customer to recover damages from his broker for such an unauthorized sale of stocks, it is not necessary that the former should have actually repurchased them, or have ordered them repurchased. The question is, when, in the exercise of reasonable diligence and judgment, ought he to have ordered a repurchase if he desired to obtain the benefit of a possible future advance in price?"

(See also *Galigher v. Jones,* 129 U. S. 193; *White v. Smith,* 54 N. Y. 522; *Cothran v. Ellis,* 107 Ill. 413; *Campbell v. Wright,* 118 N. Y. 594.) It is impossible, perhaps, upon the facts as the same appear here, to comply with the defendants' request to lay down a general rule which shall be applicable to every case in which a stock broker fails to execute his client's order. In the very nature of things the rule to be applied must depend upon the particular circumstances of the case. The damages to be allowed must be the natural proximate result of the wrong complained of; they must be such damages as were clearly within the contemplation of the parties at the time of

entering into the transaction; and they should be such damages as will make the plaintiff, in case he is entitled to recover, entirely whole. Further than this, we do not think it is necessary for the court to go.

It appears from the evidence here that at the time of entering into this contract the plaintiff was absent in the State of Florida, and that the defendants were aware of that fact. They could (had they seen fit to do so) have refused to execute the order given by plaintiff in his absence, but they did not do so. They must therefore be presumed to have known that, upon their failure to execute the order, it would be impossible, or at least an improbability, that he would discover that fact as speedily as he would have done had he been residing in Chicago and in close touch with the defendants. A customer of a stock broker cannot lie by having knowledge and speculate upon the negligence or want of diligence on the part of his broker; he must, undoubtedly, upon receiving knowledge, either that a transaction has or has not been consummated, act with reasonable promptness. It is not argued that the plaintiff in this case did not so act when in the course of his sojourn in Florida he received the news of the failure of defendants to execute his order as agreed. The correspondence and the testimony disclose facts from which the trial court might very properly find that plaintiff acted promptly in the matter and that a rise in the price of the American Tobacco Company's stock as well as the payment of a dividend in script were in the contemplation of the parties. There can be no doubt that the plaintiff sustained an actual loss to the amount which the court found by reason of the failure of defendants to promptly execute his order as given. Plaintiff is therefore entitled to be made whole, and this the damages allowed by the court does.

The judgment will therefore be affirmed.

*Affirmed.*

McSURELY, P. J., and JOHNSTON, J., concur.