FERN NIEHUSS, Plaintiff-Appellee, v. MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant-Appellant.

First District (5th Division) No. 85—1944

Opinion filed April 18, 1986.—Rehearing denied June 9, 1986.

Peter R. Sonderby and Janet L. Reali, both of Chicago (Chadwell & Kayser, Ltd., of counsel), for appellant.

Gemma Allen, of Chicago, for appellee.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This appeal is from judgment entered on a $25,000 jury verdict for plaintiff in her action to recover profits lost as a result of defendant's failure to execute her order to purchase four contracts in silver futures. Defendant contends that: (1) evidence of a settlement offer was erroneously admitted; and (2) the damage award was excessive because the trial court: (a) gave instructions as to damages which were improper and confusing; (b) refused to admit evidence of the sale by plaintiff of her substitute silver contracts; and (c) refused defendant's evidence as to mitigation of damages and its instruction thereon.

It appears that plaintiff was a sophisticated investor familiar with the intricacies of commodity trading when, on September 2, 1980, she went to an office of defendant to open a commodity trading account because she wanted to purchase contracts in silver futures. She spoke to Patrick Gorkis, an account executive, who told her that she would have to make a margin deposit of $4,000 for each of the four 1,000-ounce February 1981 silver futures contracts she wished to purchase. Plaintiff did have sufficient funds in a ready asset[1] account she had with defendant to cover the margin requirement and Gorkis ordered $16,000 transferred therefrom to the commodity trading account. Although plaintiff's monthly statement indicated that the transfer was made on September 2, Gorkis did not order the silver contracts for plaintiff on that date.

The only dispute with respect to liability is whether plaintiff placed a definite order with defendant. Plaintiff claims that she ordered the four contracts on September 2, while defendant asserts that she did not place a definite order until September 8, when she decided to purchase only two contracts. Since the parties presented conflicting testimony with respect to the events which took place between September 2 and September 8, we will summarize that testimony in more detail later in this opinion. It is undisputed, however, that the price of silver was $17.37 per ounce[2] on September 2

---

[1]This account is alternatively referred to as a ready asset, money market, ready access and stock account. For the sake of consistency, we will refer to it as a ready asset account.

[2]The parties stipulated to use of February 1981 silver prices as found in the Wall Street Journal. The exhibit which contains the prices on the Midamerican Commodity Exchange, where the contracts were traded, listed an opening, closing, high and low price for each relevant day. For purposes of this opinion, we will use the closing price unless otherwise indicated.

and that silver traded "up the limit"[3] from September 3 to September 8. On September 9 plaintiff asked Gorkis to close her commodity account and transfer her funds back to her ready asset account. (She also talked to Wilfred Fritz, the Merrill Lynch office manager, who spoke to Gorkis about the transaction.) On September 11, plaintiff opened a commodity account at E.F. Hutton. She purchased one silver contract as $21.30 per ounce on September 11 and another contract at $22.30 per ounce on September 12. The silver market reached a high of $24.25 per ounce on September 25, but plaintiff did not sell her contracts until December 1980 when she sold at $18 per ounce. Defendant was not allowed to introduce evidence of the December sale at trial.

With respect to the placement of the order, plaintiff testified that during her visit to defendant's office on September 2 she told Gorkis that she wanted to purchase four 1,000-ounce contracts in February 1981 silver. She initially told him that her son-in-law might want to purchase the silver contracts with her, but when Gorkis told her that he could not do so because he had not signed the forms, plaintiff said she would take the silver herself and settle with her son-in-law later. Although she did take additional forms home for her son-in-law, she filled out the forms for her individual account in defendant's offices and told Gorkis that she had sufficient funds in her Merrill Lynch ready asset account to cover the $16,000 margin requirement for the four silver contracts. Gorkis called her account executive to verify the amount in her account, and, when plaintiff asked whether she had to sign any papers to transfer the funds, Gorkis told her that the transfer had already been made. When plaintiff left the office on September 2 Gorkis said that he was going to order the silver immediately. She then told him that she would call him from home to find out exactly what she had to pay for it. She never reached him on September 2, so she went down to defendant's offices the next day to find out what was going on. When she asked Gorkis what she had to pay for the silver, he told her that he didn't buy it because their expert told him that silver was going to drop even further. She said that she thought it was going to go up and she wanted him to buy her 4,000 ounces immediately. She tried to call Gorkis several times after she left the Merrill Lynch office but was unable to reach him. She spoke

---

[3]As indicated in appellant's brief, "up the limit" means that the price for a particular commodity has reached the maximum daily limit set by the exchange on which it is traded and that, since trading is prohibited at a price above that limit, there will, as a practical matter, be no sell orders with which to fill the orders for silver and silver contracts cannot be purchased as a result.

to him again on September 4 at which time he told her that he could not place her order because silver was trading "up the limit." When she expressed disappointment that he had not bought the silver on the 2d or 3d as she had requested, he gave her a different excuse, telling her that he couldn't buy it on September 2 because it takes a day to transfer money from one account to another. She told him that she still wanted the four contracts but on Friday, September 5, silver was still trading up limit and she reduced her order to two contracts as a result of the higher silver prices. When the silver market was still up limit on Monday, September 8, she cancelled her order and called Gorkis on September 9 to tell him to transfer the $16,000 back to her ready asset account. She also called Fritz (the vice-president and manager of defendant's commodity office in Chicago) and told him about her problems with Gorkis. Fritz called her after talking to Gorkis and said that the latter had not ordered the silver because it takes a day to transfer money from one account to another. Although Fritz initially told her that defendant would buy the silver, then split the difference between the price on September 2 and the current price, he withdrew the offer and told her that defendant was denying all liability after she told him that she did not think the offer was fair. Plaintiff eventually withdrew all of her money from her ready asset account with defendant, and when she went to the office to pick up her check, she asked Kathleen Thompson whether it was necessary to wait a day before transferring money from one defendant account to another. Ms. Thompson replied in the negative. She also testified that a September 2 entry on her monthly account statement listed the $16,000 transfer to her commodities account.

Wilfred Fritz, vice-president and manager of the Chicago commodity office of defendant at the time of this transaction, testified that Gorkis, as an agent, was not allowed to exercise discretion in entering orders. His obligation was to place the order when he received it if an approved client had money in her account. On September 9, he had a conversation with Gorkis regarding his dealings with plaintiff on September 2. He testified as follows:

"[Plaintiff's Attorney]: And did Pat Gorkis tell you that Fern Niehuss wanted to place a silver order for four contracts for February, '81 silver, 4000 ounces; that there was some confusion with the stockbroker not being able to determine the exact amount of the money, and that the order was not placed; did he say that?

* * *

[Mr. Fritz]: That is essentially correct."

Patrick Gorkis, the commodity futures account executive of defendant with whom plaintiff dealt in September 1980, testified that she wanted to purchase a total of four silver contracts but considered doing so in a joint account with her son-in-law. He gave her the forms for a joint account, but since she could not open a joint account without her son-in-law's signature on the forms, she decided to open an individual account immediately and took the other forms home with her. Gorkis also contacted plaintiff's stockbroker with defendant to determine whether she had sufficient funds in that account to cover her margin requirements on the silver purchase. He did not tell her that there were sufficient funds to purchase the silver but instead told her at the end of their meeting that he would continue his attempts to determine the exact balance in her account. She did not give him an order for silver contracts on that day. On September 3, plaintiff called him before the silver markets had opened for the day and he told her that, based on information from their research office, he expected the markets to trade even lower than the previous day. Plaintiff personally brought the joint account forms to the office later that day and, after discussing the market and making sure that the forms were filled out properly, he introduced her to Fritz. Plaintiff did not place an order on that day because she decided to wait for a lower price, nor did she place an order when she called later that afternoon and found out that silver had closed down 17 cents. It would have been possible for Gorkis to enter an order for her on September 3 if she decided to place one. Plaintiff called him on September 4, and he told her that, although silver started trading even lower, the market reacted to a news item and was trading up limit by the close of trading. When he spoke to plaintiff about this, he told her that their research department believed that the price increase could be a temporary overreaction to an unconfirmed news article and that, if this were the case, the price of silver could go down the following day. She called him the next day when silver was again trading up the limit but she did not place an order. On Monday, September 8, with silver again trading up limit, she told him that she thought it was unfortunate that the price rose so quickly and she instructed him to enter an order for two contracts. He identified the order ticket of defendant that he entered at that time, which was date-stamped as September 8. He entered the order through the wire room and the wire reply he received stated that "order number 73 is unable, limit bid." He told plaintiff later that day that silver was trading at the daily allowable limit and that they were unable to fill her order because there were more buy orders than sell orders in the market at the limit price. She told him that she was disappointed but would call him the

following day. The next day, September 9, she told him that she was disappointed that he had not filled the contracts and told him to transfer the money in her commodity trading account back to her ready asset account. On cross-examination, he stated that he did not tell Fritz that plaintiff had placed an order on September 2. He also stated that the money was not transferred from plaintiff's ready asset account on September 2, but after he was shown a copy of the statement from the ready asset account, he admitted that the entry on September 2 indicated that $16,000 was transferred to plaintiff's commodity account.

OPINION

I

■■ Defendant first contends that the trial court erred in admitting evidence of an offer of compromise and that such error was compounded by the closing argument which referred to such evidence. Defendant correctly states that it is well established in Illinois that offers of compromise or settlement are inadmissible. (*Sawicki v. Kim* (1983), 112 Ill. App. 3d 641, 445 N.E.2d 63; see also E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 408 (4th ed. 1984).) Admissions of fact are not excluded simply because they are made in the course of such negotiations, however (*Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 410 N.E.2d 266; see also E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 408, at 184-85 (4th ed. 1984)), and a " 'statement, written or not, made by a party or in his behalf which is inconsistent with his present position may be introduced in evidence against him.' " (*Lipschultz v. So-Jess Management Corp.* (1967), 89 Ill. App. 2d 192, 200, 232 N.E.2d 485, 489, quoting *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 115, 199 N.E.2d 769, 794.) It appears here that Fritz, the manager of defendant's commodity office, made an offer of compromise which was almost immediately withdrawn and on defendant's motion *in limine*, the trial court ruled that any admission of liability by defendant would be admitted into evidence but that actual discussion of settlement was inadmissible. Despite its prior ruling, the trial court allowed the following testimony over the objection of defendant:

"Q. What did he [Fritz] say to you and what did you say to him in this second phone conversation?

\* \* \*

[Plaintiff]: And he said that the reason that Mr. Gorkis didn't order the silver was because it takes a day to transfer money from one account to the other.

* * *

Q. And what did you say to him and what did he say to you when he called you back?

[Plaintiff]: He said, 'Well now, Ms. Niehuss, we are going to come to a mutually agreeable settlement on this thing.' And he said, 'I propose that Merrill Lynch will buy in the silver and we'll split the difference with you,' between the price of what it was when I was in the office on September the 2nd and what it was that day.

Q. And what was your response, if you remember?

A. I said, 'Well, I don't think that's fair to try to make me pay for Mr. Gorkis' error.'

* * *

Q. Did he call you back?

A. Well, he called me back immediately. He said that he was withdrawing his offer to buy the silver.

And I said, 'Well, that's all right because I didn't consider it fair anyway.'

* * *

Q. And what did he say to you in this conversation and what did you say to him?

A. He said that they were denying all liability. And I said, 'Well, I don't think it's fair.' "

■ Defendant first maintains the court erred in allowing the portion of plaintiff's testimony which included Fritz' statement that Gorkis did not order the silver because it was not an admission of a disputed fact, in that defendant did not deny that it failed to place an order for plaintiff but instead denied that plaintiff had ever placed a definite order. Defendant thus argues that it does not dispute the "admitted" fact that an order was not placed. Although defendant's argument may be somewhat tenable on its face, it ignores plaintiff's further testimony that Fritz told her that "the reason Mr. Gorkis didn't order the silver was because it takes a day to transfer money from one account to the other." We find that this specific reason for Gorkis' failure to order the silver impliedly admits that an order was placed and was sufficiently inconsistent with defendant's claim that no silver order was placed by plaintiff on September 2 as to constitute an admission of a disputed fact and, as such, was properly received. Moreover, we note that Fritz also gave the following testimony concerning an order by plaintiff to Gorkis on September 2:

"Q. And did Pat Gorkis tell you that Fern Niehuss wanted to place a silver order for four contracts for February, '81 silver,

4,000 ounces; that there was some confusion with the stock-broker not being able to determine the exact amount of the money, and that the order was not placed; did he say that?

A. Well, which date are you speaking of?

Q. Well, the conversation you had with him on September 9 about September 2.

A. Oh, all right.

Q. Did he say that to you?

\* \* \*

A. That is essentially correct."

Plaintiff's complained of testimony concerning the conversation between Fritz and Gorkis regarding her placement of an order was therefore cumulative to that of Fritz and thus, even if we had found was improperly admitted, it would not constitute reversible error. See *Stromquist v. Burlington Northern, Inc.* (1983), 112 Ill. App. 3d 37, 444 N.E.2d 1113.

■■ ■ Defendant also argues that, in any event, it was error to allow testimony concerning the actual settlement offer and that the emphasis thereon in plaintiff's closing arguments had an extremely prejudicial effect on the jury's determination of liability. We agree that it was improper to admit the testimony of plaintiff regarding the actual settlement offer (*Sawicki v. Kim* (1983), 112 Ill. App. 3d 641, 445 N.E.2d 63), and we also note that the prejudicial effect of an admission of such evidence and emphasis thereon in closing argument is generally not cured by a jury instruction that an offer of settlement should not be considered an admission of liability (*Sawicki v. Kim* (1983), 112 Ill. App. 3d 641, 445 N.E.2d 63), but in the context of this case we do not believe that reversal is required. "Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed." (*J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.* (1985), 108 Ill. 2d 106, 115, 483 N.E.2d 273, 277; see also *Sale v. Allstate Insurance Co.* (1984), 126 Ill. App. 3d 905, 467 N.E.2d 1023.) The only disputed issue here with respect to liability was whether plaintiff had actually placed an order on September 2, and it is our view that the evidence with respect thereto was not closely balanced. Plaintiff testified that Fritz told her that the order was not placed because Gorkis could not verify that she had sufficient funds to cover the margin requirement. Fritz' testimony corroborated plaintiff's testimony in that regard, and we have previously found that giving a reason, as defendant did here, for the failure to place an order amounted to an admission that plaintiff had placed an

order on September 2. We note also in passing that Gorkis testified to a version of the events which was inconsistent both with defendant's documents and with his own manager's account of his conversation with Gorkis. For example, Gorkis testified that the fund transfer did not occur on September 2, yet from defendant's account statement it appeared that the funds had, in fact, been transferred on September 2, and Gorkis admitted that the silver could have been purchased for her on September 3, when even he admits the funds had been transferred. The jury verdict with respect to liability was thus supported by defendant's own witness and, in the light thereof, we affirm the judgment with respect to liability.

## II

■ Defendant also contends that improper jury instructions and rulings restricting the admission of relevant evidence regarding plaintiff's silver transactions resulted in an excessive damage award. We initially note that neither the briefs before this court on appeal nor the instructions and objections thereto clearly articulated the proper theory of damages. Because of our view as to proper measure of damages, we agree that the jury award was excessive, and we cannot say that the award was not affected by the improper admission of, and reference to, the evidence of defendant's settlement offer. In the light thereof, we will reverse the judgment with respect to the award of damages and will remand for a new trial as to damages.

■ In doing so, it will be necessary that we determine the appropriate measure of damages, and in this regard we note that in *Galigher v. Jones* (1889), 129 U.S. 193, 32 L. Ed. 658, 9 S. Ct. 335, the United States Supreme Court set forth the proper method of calculating damages when items of fluctuating value, such as the commodity futures contracts at issue here, are wrongfully sold, converted, or not purchased when there should have been a purchase. The court held that the measure of damages in transactions which involved profits lost as a result of the wrongful conduct was as follows:

"the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter, to be allowed to the party injured to place himself in the position he would have been in had not his rights been violated." (*Galigher v. Jones* (1889), 129 U.S. 193, 200, 32 L. Ed. 658, 660, 9 S. Ct. 335, 337.)

Thus, as here, where the customer did not own the stock at the time of the wrongful act, the measure would obviously be the difference between the price at which it was ordered and this highest intermediate

value. (See *Bushnell v. Curtis* (1925), 236 Ill. App. 89.) With respect to the appropriate time at which to measure such value, the court in *Galigher* adopted the New York rule,[4] which found damages to be "the highest intermediate value of the stock between the time of its conversion and *a reasonable time after the owner has received notice of it to enable him to replace the stock.*" (Emphasis added.) (*Galigher v. Jones* (1889), 129 U.S. 193, 201, 32 L. E. 658, 661, 9 S. Ct. 335, 338.) Illinois adopted the reasoning of *Galigher* as to measure of damages in *Bushnell v. Curtis* (1925), 236 Ill. App. 89.

In the instant case defendant's instruction states that damages for failure to execute plaintiff's order should place her in the position she would have been in had her order been executed and that damages may not be based on speculation, guess or conjecture. Plaintiff's instruction was as follows:

> "Damages in a case of a failure of a broker to perform his contract are the difference between the price for the stock or commodity at the time it was ordered and the market price within a reasonable time after the plaintiff was informed of the broker's mistake."

Both instructions were given to the jury and, although it is our view that plaintiff's instruction correctly stated the basic measure of damages as adopted in *Bushnell v. Curtis*, we do not believe that the instructions as given provided sufficient guidance to the jury in determining damages. It appears to us that because no instruction was given concerning the "reasonable time period" referred to in *Bushnell*, plaintiff was able to argue that September 25, the day that Silver prices reached their high, was a "reasonable time" after plaintiff was informed on September 3 that defendant had not placed her order and thus that she should receive the difference between the price at the time she placed her order and the high price of $24.25 per ounce on September 25, and we note that the jury verdict came close to allowing this maximum measure of damages.[5] We note, however, that such a

---

[4]This rule has been further refined to eliminate a possible windfall to a claimant where the property reaches its highest price in the period between its conversion and the claimant's notice of the conversion (see *Schultz v. Commodity Futures Trading Com.* (2d Cir. 1983), 716 F.2d 136, 140-41, citing *In re Salmon Weed & Co.* (2d Cir. 1931), 53 F.2d 335), but that refinement is not applicable here.

[5]One court has observed that, while it would be unjust to limit damages to the value at the time of the broker's error, it would be similarly unjust to calculate damages by using the "highest value attained by the stock at a point in time well after an injured party who wanted to continue speculating in the market knew his shares were lost and could have replaced them." *Schultz v. Commodity Futures Trading Com.* (2d Cir. 1983), 716 F.2d 136, 140.

determination of the "reasonable time period"—22 days in an extremely volatile futures market—is without precedent (*Letson v. Dean Witter Reynolds, Inc.* (N.D. Cal. 1982), 532 F. Supp. 500, 503-06, *aff'd sub nom. Shearson Loeb Rhoades, Inc. v. Bryant* (9th Cir. 1984), 730 F.2d 769), and appears not to comport with the basic principle that damages must be the natural proximate result of the broker's failure to place the order (*Bushnell v. Curtis* (1925), 236 Ill. App. 89). This is particularly apparent here, where plaintiff in fact did not sell her silver contracts until December 1980 when the price had dropped back to $18 per ounce. While defendant also argues that it should have been allowed to present evidence of that December sale to show that her loss was at least partially the result of her own trading decision, we will not consider this argument because of our belief that the correct measure of damages would more appropriately have been arrived at by properly limiting the reasonable period.

■ In attempting to limit such "reasonable time period," defendant did tender a jury instruction on mitigation of damages, a modified IPI Civil 2d No. 33.02 (Illinois Pattern Jury Instruction, Civil, No. 33.02 (2d ed. 1971)), which was refused. It argues that this instruction should have been given because "she did not take any action to mitigate damages by purchasing silver contracts elsewhere until September 11." We disagree, however, because it is well established that an injured party is not required to actually enter the market to determine if and when she might have done so (*Tark v. Shearson/American Express, Inc.* (1984), 123 Ill. App. 3d 75, 80, 462 N.E.2d 610, citing *Schultz v. Commodity Futures Trading Com.* (2d Cir. 1983), 716 F.2d 136, and *Letson v. Dean Witter Reynolds, Inc.* (N.D. Cal 1982), 532 F. Supp. 500; see also *Bushnell v. Curtis* (1925), 236 Ill. App. 89), but, as stated in *Bushnell v. Curtis*, " '[t]he question is, when, in the exercise of reasonable diligence and judgment, ought he [the injured party] to have ordered a repurchase ***?' " *Bushnell v. Curtis* (1925), 236 Ill. App. 89, 102, quoting *Ling v. Malcom* (1905), 77 Conn. 517, 526, 59 A. 698, 702.

■ In the instant case, however, this question was answered by plaintiff, who reentered the market by her purchases through another source of one silver contract on September 11 and another on September 12. By so doing, she established the outer limit of a "reasonable time period" during which the intermediate value of those two contracts could be ascertained. (See *Schultz v. Commodity Futures Trading Com.* (2d Cir. 1983), 716 F.2d 136.) Plaintiff's recovery on those two contracts, therefore, cannot be

greater[6] than the difference between the price on September 2 and the prices at which she actually purchased them on September 11 and 12.

Concerning the other two contracts of the four originally ordered by plaintiff, we note that the "reasonable time period" represents "the time during which the trader is *involuntarily* out of the market \*\*\*." (Emphasis added.) (*Letson v. Dean Witter Reynolds, Inc.* (N.D. Cal. 1982), 532 F. Supp. 500, 503.) Here, it is noted that plaintiff reduced her original order to two contracts when she spoke to Gorkis on September 5 and because the record discloses that she either had or was able to obtain sufficient funds to purchase the other two at that time, she thus decided to voluntarily remove herself from the market as to those two contracts on September 5. Her damages as to them is therefore measured by the difference between the price at the time of her original order on September 2 and the price on September 5. See *Chipser v. Kohlmeyer & Co.* (5th Cir. 1979), 600 F.2d 1061.

Summarizing, we have affirmed the judgment with respect to liability, but have reversed it with respect to the award of damages, and we remand for a new trial on the issues of damages consistent with the content of this opinion.

Affirmed in part; reversed in part; remanded for new trial as to damages only.

PINCHAM and LORENZ, JJ., concur.

---

[6]Although defendant could properly argue at trial that plaintiff could have repurchased earlier than September 11 and 12, we note that defendant's broker testified that the market was trading up limit from September 4 to September 8 and market conditions thus almost completely precluded silver purchases during that time.