PAMELA PINSON SALE, Conservator of the Estate of Maxine Pinson, Incompetent, Plaintiff-Appellant, *v.* ALLSTATE INSURANCE COMPANY, Defendant-Appellee.

First District (4th Division)   Nos. 82—655, 82—720, 82—2326 cons.

Opinion filed August 2, 1984.—Rehearing denied August 30, 1984.

William J. Harte, Ltd. and Philip F. Maher, both of Chicago (William J. Harte, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (John L. Kirkland, D. Kendall Griffith, Thomas M. Hamilton, Stephen R. Swofford, and David H. Levitt, of counsel), for appellee.

JUSTICE JOHNSON delivered the opinion of the court:

Plaintiff, Pamela Pinson Sale, conservator of the estate of Maxine Pinson, an incompetent, appeals (1) the trial court's dismissal of counts III, V and VII of her complaint for failure to state a cause of action; (2) a jury verdict in favor of defendant, Allstate Insurance Company (Allstate), on count IV: and (3) the trial court's award of attorney fees. Plaintiff raises the following issues for review: (1) whether the trial court erred by failing to instruct the jury of another trial judge's findings in a summary judgment order; (2) whether the trial court erred in dismissing counts III, V and VII of her complaint at law; (3) whether section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1979, ch. 73, par. 767) provides an exclusive remedy for wrongful conduct of an insurer; (4) whether it was error to tender certain instructions to the jury; (5) whether she is entitled to a new trial because of false answers given by a juror on *voir dire*; and (6) whether the trial court erred in determining the amounts of attorney fees.

We affirm in part and reverse in part and remand.

On October 15, 1974, Maxine Pinson filed a four-count complaint against defendant Allstate. She alleged that on February 12, 1972, she was seriously injured in an automobile accident. At that time Pinson was covered by defendant's automobile insurance policy, which included a provision for extended personal injury protection or "no fault" insurance. Under the no-fault plan, defendant agreed to pay all reasonable medical expenses and lost earnings at a maximum rate of $150 per week for a period of 260 weeks during permanent disability. The policy incorporated by reference article 35 of the Illinois Insurance Code (Ill. Rev. Stat. 1971, ch. 73, par. 1065.150 *et seq.*).

As a result of the accident, Pinson received a depressed skull fracture of her right temporal and parietal bones. During emergency surgery, one inch of her brain was removed. Her condition was diagnosed as organic brain disease syndrome due to trauma suffered in the accident. Pinson alleged that since the accident she had been unable to function independently and needed continual and constant medical care and supervision. Prior to the accident, Pinson worked for Scott Foresman Company and created advertisements for education textbooks. After her accident, Pinson was unable to prepare any copy.

Allstate made payments of medical and lost income benefits under the policy from the time of the accident in February 1972 until April 1973. Pinson alleged that Allstate wilfully refused to pay the benefits owing to her and sought to compromise the amount owing and expunge any future obligation to her.

In count I, Pinson alleged that defendant was liable for triple damages under article 35 of the Illinois Insurance Code for wilful refusal to pay under the terms of the insurance policy. In count II, she asked for judgment against defendant for the amount of unpaid benefits of $19,322.36 plus interest, and for treble damages of $57,967.08. In count III, she asked punitive damages of $100,000, and in count IV she asked damages of $200,000 for intentional infliction of mental distress.

On August 12, 1975, on defendant's motion, the trial court dismissed count I. The trial court clarified this order on December 4, 1975, stating that count I was dismissed only insofar as it pertained to the recovery of triple damages under article 35 of the Illinois Insurance Code. Pinson appealed and this court reversed and remanded the trial court's order. We held that section 603(b) of the Illinois Insurance Code (Ill. Rev. Stat. 1971, ch. 73, par. 1065.153) was incorporated into Pinson's insurance policy and that Allstate impliedly waived its unconstitutionality defense to the payment of treble damages to Pinson. The cause was remanded for a determination of whether Allstate's refusal to pay Pinson benefits was in fact wilful. *Pinson v. Allstate Insurance Co.* (1979), 68 Ill. App. 3d 788, 791, 386 N.E.2d 638, 641.

On December 22, 1977, before the first appeal was decided, the trial court issued an order in which it found that Maxine Pinson was totally disabled within the meaning of her insurance policy and was entitled to lost income and medical benefits. Allstate was ordered to pay all lost income and medical benefits. The trial court found that Allstate wilfully refused to comply with its contractual obligation to Pinson insofar as it refused payment of lost income after reasonable

proof of total disability and that it failed to pay medical care benefits as they were submitted.

On October 27, 1980, Pinson filed an amended four-count complaint. Subsequently, Pamela Pinson Sale, Pinson's daughter, became her conservator and was substituted as plaintiff in this case. Sale added counts V, VI and VII. The trial court dismissed count V and the amended count V and count VII. Immediately before the trial began, the trial court ruled that the jury would not be instructed as to Judge Dunne's findings in his December 22, 1977, order.

THE TRIAL: PLAINTIFF'S CASE

The trial began on September 22, 1981, on the issue of Allstate's refusal to pay benefits to Pinson (count IV). Numerous documents from Allstate's file on her were introduced during testimony. Following her accident on February 12, 1972, Pinson was hospitalized at Evanston Hospital, in Evanston, Illinois. Allstate received an authorization for medical information dated February 19, 1979, from Pinson's daughter.

A note, dated February 22, 1972, signed by Dr. Joseph Tarkington, who operated on Pinson, stated that she was difficult to get along with. Although she functioned well on her job, she had been an alcoholic for years; she had received numerous psychiatric treatments and often expressed a desire to die. Pinson's daughter felt that her mother had no will to live and would be angry if she survived.

In April 1972, Pinson was transferred to Normandy House, a nursing facility, where she remained until August 1972.

Maxine Wilieko testified that in 1972 she was employed as a no-fault specialist by defendant. In January 1972, Allstate offered personal injury protection which allowed a party to recover for medical expenses and loss of income regardless of who was at fault. If the claim exceeded a certain amount, it would be referred to a regional office; an even higher amount was referred to the home office, which is the highest level of authority. Wilieko handled Pinson's claim. She recalled that when she spoke by telephone to Pinson on April 25, 1972, the latter was coherent and realized that Wilieko was handling her claim. Wilieko sent an adjustor, Steven Hecht, to see Pinson. He saw her for about two minutes. In a report dated June 20, 1972, he wrote that Pinson was very feeble. Pinson said she was all right physically, but Hecht observed that she was slow to respond to questions, confused and barely audible. She did answer questions somewhat normally. A nurse concluded that Pinson would probably never be released to society.

Wilieko prepared a report, dated July 20, 1972, on Pinson's claim in which she wrote that coverage was applicable. On that date, $13,272.10 had been paid out and $45,500 had been put in reserve. Eventually the home office agreed to Wilieko's recommendation to reserve the policy and its limits. In another report dated July 20, 1972, after a visit to Scott Foresman, an Allstate employee reported that Pinson was a very good employee.

Ronald Casper, a casualty unit manager and district claim manager for Allstate, was called by plaintiff as an adverse witness. He supervised the Pinson claim. In Pinson's insurance policy, total disability was defined as the inability of the injured person to engage in his ordinary occupation. Pinson's claim was reviewed at three levels: at the district level, it was reviewed by a personal injury protection (PIP) examiner and by a casualty claims supervisor; at least two people reviewed the case at the regional level; and the then managing attorney, Ed Matus, reviewed it for the home office. In a letter dated August 18, 1972, Matus stated the following: "We may well decide to lump sum settle providing we have assurance that condition is totally disabling but general state of health indicates continued survival is expected."

On August 31, 1972, Pinson was transferred to Brookwood Convalescent Center. Sal Dragotta, an Allstate adjuster, visited her in September 1972 for 15 to 20 minutes. She was withdrawn and not communicative.

Plaintiff introduced two Allstate forms entitled "Attending Physician's Report" for Pinson. A question on the forms was "if still disabled, date patient should be able to return to work." One response was "indefinite"; the other response was "undetermined—probably never."

On April 6, 1973, Dave Auerbach, an Allstate adjuster with a reputation for tenacity, visited Pinson at Brookwood. His purpose was to see whether she was still totally disabled. Pinson was neat and well-dressed. Auerbach saw some books with intellectual content on her bedside table. Two or three times Pinson said, "that is all I have to say," indicating she was not going to answer any more questions. But Auerbach politely continued to question her. Auerbach testified that he was polite at all times and there was no tension during the interview. Based on Auerbach's report, it was the opinion of Casper (supervisor of Pinson's claim) that Pinson was still disabled.

An Allstate request for authorization for a payment to Pinson dated April 16, 1973, contained the following statements by its employees:

"Although this file is under investigation, I do not feel we have reason to stop payments at this time."

"At this time we have no actual proof that the bills were not as a result of this accident."

"Consider use Dr. Barbakoff, etc. to review medical records, etc."

On April 23, 1973, Allstate stopped its payments to Pinson. According to an Allstate document dated April 25, 1973, Pinson's attorney should be informed that further payments would not be made until the causal connection was resolved.

In July 1973, Pinson was transferred to another nursing home, the Magnus Farm.

By August 1973, Allstate had obtained all of Pinson's medical records, which it sent to Dr. Barbakoff for his review and opinion. According to a former Allstate employee, Gerald Seidl, serious injury claims were referred to Barbakoff, who had a reputation for writing reports favorable to the defense. Dr. Barbakoff reported that Pinson was an "individual with chronic mental illness who with the aid of psychotherapy, alcohol, cigarettes and coffee *** was able to remain functional, although very brittle." (Records from a prior hospitalization referred to alcoholism and psychiatric help.) It was Barbakoff's opinion that the accident precipitated Pinson's breakdown.

After reviewing this report, Casper, who supervised the Pinson claim, wondered whether the accident caused Pinson's health condition or was merely the precipitating factor. Casper acknowledged that a pre-existing condition which aggravates an injury is not a defense for Allstate under a no-fault policy.

Cathy Haskin, an Allstate employee, described in a written report her telephone conversation with Pinson's daughter on September 26, 1973. Sale asked about her mother's insurance payments. She said her mother could not take care of herself; that she visited her mother the day before and Pinson did not know her.

On October 23, 1973, Haskin visited Pinson at the Magnus Farm. Pinson was receiving no therapy or psychiatric treatment. Haskin concluded that Pinson needed help. Under the no-fault policy, Allstate assisted in the rehabilitation of its insured. During the interview, Pinson was alert and understood and answered all of Haskins's questions. She was no longer being treated for injuries sustained in the accident. Haskin concluded that Pinson's "need to remain in a nursing home and her inability to work" related to her mental condition, and that her mental condition related to her past condition rather than her accident.

In a letter dated December 26, 1973, Haskin wrote to Pinson's attorney informing him that her investigation indicated that his client had completely recovered from the injuries she received in the accident, and that Allstate would make no further payments until he disproved Allstate's contention.

Allstate received through Pinson's attorney letters written in January and February 1974 which described her condition. A letter from her employer, Scott Foresman, described Pinson as a good employee with an "active, intelligent mind" who prepared advertising for high school textbooks. After her accident, Pinson was given small writing assignments. Although she showed some interest, she was unable to prepare any copy or give ideas or suggestions about the assignment, a reaction which was totally unlike her former one.

Dr. Tarkington, who treated Pinson at Evanston Hospital, wrote, "The fact that she [Pinson] was productive up to the day before the accident and has not been able to work since then is strongly indicative of the presence of underlying brain damage." Dr. Arthur Peterson, who treated Pinson while she was at Normandy House, stated that he felt very strongly that Pinson's physical and mental conditions were related to her accident. Dr. Floreani, who treated Pinson at the Magnus Farm, stated that Pinson's physical and mental conditions were directly related to her accident. Robbie Clifton, the nursing supervisor at Magnus Farm, wrote that Pinson "could not function alone at home and definitely would be unable to work."

In memoranda dated March 4, 1974, Charles Goodrode, a casualty claim supervisor, and W. M. Garvey, senior district claim manager, agreed that a compromise of Pinson's claim was in order. Goodrode wrote, "[t]his file in my opinion would be very costly to defend and the sympathy of the jury would be in favor of an old lady who can not at this time, care for herself." At that time, Allstate had $33,352.30 in reserve to be paid out for Pinson's claim.

Negotiations to compromise the claim began in April 1974 between Casper, Sale and her husband and Pinson's attorney, Edward Holtsberg. Allstate's original offer was $5,000, which was eventually raised to $10,000. Casper was authorized to negotiate up to $15,000.

To establish a cause of action for intentional infliction of mental distress, plaintiff tried to show that Pinson deteriorated after visits from Allstate adjusters and after the termination of insurance payments. She also elicited testimony from expert witnesses.

Allstate adjusters visited Pinson on four occasions—in June and September 1972, and in April and October 1973.

In a Normandy House progress note on Pinson dated May 23,

1972, her psychiatrist observed that she wanted to live in her apartment. He stated that it might be helpful to try this for a week or two if improvement continued and supervision by a homemaker could be provided. A note dated July 10, 1972, after the first visit by an adjuster, stated that Pinson was fearful and apprehensive and that it might be necessary to transfer her to a short-term psychiatric facility. However, a note dated June 7, 1972, before the adjuster's visit, stated that Pinson was confused, with some delusions.

On August 31, 1972, when Pinson was transferred from Normandy House, her treating physician, Dr. Arthur Peterson, gave as his prognosis that she could have recovered to the point where she could live alone.

A Brookwood progress note dated March 21, 1973, stated that Pinson had improved a great deal; she had sat through 1½ hours of Bingo, was exercising again, and had calmed down quite a bit. Dave Auerbach visited Pinson on April 6, 1973. Plaintiff elicited testimony from Ronald Casper, who supervised Pinson's claim, that Auerbach had a reputation for tenacity. Gerald B. Seidl, who worked for Allstate as an adjuster and claim supervisor, testified that Auerbach had a reputation as a hard-nosed, short-tempered adjuster. A progress note dated April 30, 1973, after Auerbach's visit and after Allstate payments to Pinson were stopped, stated that Pinson had regressed and seemed nervous.

On October 23, 1973, Allstate adjuster Cathy Haskin visited Pinson at the Magnus Farm. On November 2, 1973, Pinson stabbed a staff member in the hand with a pair of scissors.

Gerald Seidl, a former Allstate employee, testified that he would not have sent an adjuster for a direct check on an insured as long as the person was still in a nursing home.

Several physicians and a psychologist testified on Pinson's behalf.

Joseph Tarkington, a neurosurgeon who operated on Pinson after her accident, testified that when he last saw her in June 1972, she was improving. On cross-examination, he admitted that he did not expect her to recover completely.

Arthur Peterson treated Pinson at Normandy House. His prognosis for her was that she would recover sufficiently to live alone.

Sam Kruger treated Pinson at Brookwood. He stated that financial problems are among the major problems that elderly people have. They become very disturbed when financial loss occurs. In his opinion, the visit by an Allstate adjuster could have put stress on Pinson and caused her regression in April 1973. Also stressful is the transfer of an older person from one nursing home to another. On cross-examina-

tion, Kruger acknowledged that on the two nights following the adjuster's visit, April 6-7, nurses' notes indicated that Pinson slept well and had a quiet night.

Evan Floreani treated Pinson at the Magnus Farm, a shelter care facility which provided no therapy. During her stay, Pinson deteriorated. In Floreani's opinion, Pinson would have benefited more from a skilled-care facility.

Theodore Homa began treating Pinson in July 1979 at Brookwood. He stated that she required skilled nursing care, that is, supervision by a registered nurse. Pinson had to be dressed, bathed, fed and cleaned and must be tied to a chair. Her condition was permanent and she would continue to need the same level of skilled nursing care. No life-threatening condition would shorten her normal life expectancy. At the time of trial, Pinson was 69 years old and had a life expectancy of 14.4 years.

Marshall Silverstein, a clinical neuropsychologist, reviewed the Allstate file on Pinson and the notes on her from the nursing homes. He explained in great detail the basis for his opinion that Allstate's handling of Pinson's claim caused her to deteriorate mentally and emotionally.

Robert Richardson, a neurosurgeon, gave as his expert opinion that Allstate's handling of Pinson's case caused her severe emotional stress and anxiety resulting in aggravation of her recovery and her deterioration.

Plaintiff introduced into evidence a videotape made on March 14, 1980, showing a typical day for Pinson in the nursing home.

Margaret Schwenn, who had known Pinson for 18 or 20 years at the time of her accident, testified that Pinson was very intelligent. Schwenn visited Pinson frequently at the hospital and the nursing homes. During her stays at Evanston Hospital and Normandy House, Pinson improved. At Brookwood, Pinson at first made progress. While there, she expressed to Schwenn her worries about her financial condition and whether she would work again. In her last few months at Brookwood, Pinson began to deteriorate. While at the Magnus Farm, Pinson did well at first and then deteriorated.

Pamela Pinson Sale, daughter of Maxine Pinson, testified that before the accident her mother was extremely intelligent and enjoyed her work. While in Evanston Hospital, her mother improved from a comatose to an ambulatory condition. She would walk and feed herself and was becoming verbal. In April 1972, Pinson went to Normandy House, but in June she had a setback and became fearful and apprehensive. After that, she improved slightly. In August 1972, Pin-

son moved to Brookwood. By the spring of 1973 she started to deteriorate. She was always worried about finances and would ask her daughter repeatedly who was paying her bills. Pinson said she did not have enough money and would be put out of the nursing home. Sale would try to reassure her mother.

In April 1973, Pinson's Allstate benefits stopped, but she still received about $500 a month through her employer and $193 in social security benefits. In May 1973, Sale considered transferring her mother to the Magnus Farm because it was cheaper than Brookwood and her mother might live to extreme old age as her parents and grandmother had. The difference in the cost of the homes was about $200 per month. At the time, Pinson had about $25,000. Except for the move to Magnus Farm, Pinson's care has never been restricted for financial reasons.

According to Sale, at the end of her Brookwood stay, Pinson was withdrawn. Sale visited her mother at the Magnus Farm after Allstate adjuster Haskins' visit in October 1973. Pinson was upset and afraid that there was a problem with her insurance. Sale always reassured her mother, but the latter would not believe her and continued to ask about finances. Thereafter, Pinson gradually deteriorated. At the time the lawsuit was filed in October 1974, Pinson had about $25,000.

DEFENDANT'S CASE

At the close of plaintiff's case, defendant moved for a directed verdict which was denied. Defendant called Pamela Sale as an adverse witness. Then defendant called Mary Feasley, an employee of Great American Life Insurance, who explained the insurance plan for employees of Scott Foresman. Feasley described the benefits paid to Pinson by Great American.

Defendant also called as witnesses Steven Hecht, Sal Dragotta and David Auerbach, the adjusters, who described their visits to Pinson at the nursing homes.

Roy Hammond, president of American Mutual Re-Insurance Co., testified that Allstate's handling of Pinson's claim was customary, appropriate and fair. Allstate terminated benefits in a good-faith belief that there was a causation question. Nothing in the file indicated an intent to harm Pinson, or recklessness.

Two physicians testified as expert witnesses. Alex Arieff, who is board-certified in neurology and psychiatry, reviewed Pinson's file and stated that Allstate's handling of her case had nothing to do with her subsequent deterioration. He testified extensively as to the basis for

his opinion. Nicholas Wetzel, a neurological surgeon, reviewed the same documents and explained in detail the basis for his opinion that visits by Allstate adjusters and termination of her benefits did not cause severe emotional stress, aggravating her recovery and resulting in deterioration.

At the close of trial, the jury found in favor of defendant Allstate and against plaintiff.

In appeals Nos. 82-655 and 82-720, plaintiff raised issues concerned with the pleadings and the trial. Appeal No. 82-2326 raised issues with regard to attorney fees. All three appeals have been consolidated in this opinion.

PRIOR TRIAL COURT FINDING

█ The first issue raised by plaintiff is whether the trial court erred by failing to instruct the jury of Judge Dunne's findings in his December 22, 1977, summary judgment order. In that order, Judge Dunne denied defendant's motion for summary judgment on count I, but sustained plaintiff's motion for summary judgment on count I, holding that "Allstate willfully refused to comply with its contractual obligation in its relationship with its insured, Maxine Pinson, in that it refused payment of lost income after reasonable proof of total disability and failed to pay medical care benefits as they were submitted to the company." In count I, plaintiff alleged a cause of action for breach of the insurance contract which incorporated by reference the Illinois Insurance Code that contained a provision for the payment of triple damages for wilful refusal to pay under the terms of an insurance policy.

Immediately before trial, the court refused to instruct the jury on the finding, stating that Judge Dunne's finding was not a final judgment; there was no inconvenience to the parties because Allstate's refusal to pay would be fully presented at trial; public policy favored jury determination of fact issues; and the finding was not one of ultimate fact. Further, the "willfulness" issue was not litigated for count IV, which was the intentional infliction of emotional distress issue the jury would decide.

Plaintiff contends that Judge Dunne's finding with respect to count I was binding as collateral estoppel with respect to count IV. In her view, Judge Dunne's finding meant that she only had to prove that defendant's wilful conduct caused Pinson's severe emotional distress. Plaintiff argues that she was prejudiced because she had to relitigate the issue of whether defendant's conduct was wilful, and that she was forced to educate the jury on the entire claim-handling proce-

dure, inform them of its intricacies and the type of contractual coverage offered under the no-fault policy. She contends that Allstate was allowed to argue that its conduct was merely a mistake, and that its investigation was necessary because of Pinson's history of possible alcoholism and need for psychological counseling. According to plaintiff, defendant's argument clouded the jury's judgment by obscuring the real issues in the case.

We disagree with plaintiff for two reasons. First, we have examined the trial transcript and find no prejudice to plaintiff. We do not understand how a mere jury instruction that defendant wilfully refused to pay could have materially or substantially altered the presentation of plaintiff's case. The instruction did not define an element of the tort of intentional infliction of emotional distress. Secondly, we disagree that plaintiff merely had to show that defendant's wilful conduct caused Pinson's severe emotional distress. To establish intentional infliction of emotional distress, the conduct complained of must be extreme and outrageous. Liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression or trivialities. It is not enough that defendant acted with an intent which is tortious or even criminal, or that he intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character and so extreme in degree as to go beyond all bounds of decency. (*Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767.) Judge Dunne's finding that defendant's conduct was wilful was not a finding that defendant acted with the intent that is an element of the tort of intentional infliction of emotional distress. Rather, Judge Dunne found that defendant wilfully breached its contract with Pinson. It was the jury's duty, in the instant case, to determine whether defendant's intent met the standards for intentional infliction of emotional distress. Therefore, we hold that the trial court did not err in refusing to instruct the jury regarding the prior finding of wilful refusal to pay.

Plaintiff raises several issues with respect to the dismissal of certain counts of her complaint.

### DISMISSAL OF COUNT III

Plaintiff argues that the trial court erred in dismissing count III of her amended complaint which prayed for punitive damages for the wilful refusal to pay benefits. On December 10, 1980, the trial court granted defendant's motion to dismiss count III based on *Tobolt*

*v. Allstate Insurance Co.* (1979), 75 Ill. App. 3d 57, 393 N.E.2d 1171, which held that section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1977, ch. 73, par. 767) pre-empted the field and precluded such a cause of action. Section 155 provides in pertinent part as follows:

"In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $5,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action." Ill. Rev. Stat. 1977, ch. 73, par. 767.

Plaintiff insists that section 155 does not provide an exclusive remedy for wrongful conduct by an insurer and that the trial court should have relied on *Lynch v. Mid-America Fire & Marine Insurance Co.* (1981), 94 Ill. App. 3d 21, 418 N.E.2d 421, which held that prior to the 1977 amendment of section 155, there existed a tort action for refusal of an insurer to make payments due its insured.

In her reply brief, plaintiff further argues that section 155 should be construed only as awarding attorney fees and not as precluding the recovery of punitive damages and cites for support a federal district court opinion, *Roberts v. Western-Southern Life Insurance Co.* (N.D. Ill. 1983), 568 F. Supp. 536. The issue in *Roberts* was whether an insured person or entity may, under Illinois common law, maintain a cause of action against an insurer for its bad faith conduct in handling a claim under an insurance policy. The district court ruled that before 1977 section 155 did not preclude a common law tort claim for an insurer's bad faith conduct. (568 F. 2d 536, 547.) The court rejected the view that the statutory and common law torts are duplicative and noted that the statute did not declare itself the exclusive remedy for injuries caused by an insurer's bad faith conduct. (568 F.2d 536, 548-49.) It stated that section 155 created a standard for recovery easier to satisfy than under the common law tort. 568 F.2d 536, 548.

Plaintiff also contends that section 155 is unconstitutional, stating that she has a constitutionally guaranteed right to bring an action for damages for injuries caused by the wrongful conduct of another and this right includes the right to seek punitive damages. According to plaintiff, the trial court's interpretation of section 155 is constitutionally infirm because it distinguishes between first- and third-party claimants. There is no compelling State interest on which to base this distinction, and such an interpretation does not serve public policy interests.

Finally, plaintiff argues defendant is precluded from raising the issue that her complaint does not allege a cause of action because previous defense motions were not concerned with the sufficiency of factual allegations in the complaint. Plaintiff cites the rule that an attack on the sufficiency of pleadings is waived where it is raised for the first time on appeal.

Plaintiff's arguments confuse the issue with respect to count III. In count I of her amended complaint, plaintiff alleged breach of contract and referred to section 603(b) of the Illinois Insurance Code which provided in pertinent part that "[i]n the event of a wilful refusal of the company to pay such benefits, the company must pay to the other party, an amount which is three times the amount of unpaid benefits in controversy in the action." In count II, plaintiff alleged that defendant wilfully breached its contract and showed bad faith, and she prayed for damages in the amount of unpaid benefits and for treble damages. In count III, plaintiff alleged that defendant breached its duty of good faith and fair dealing by wilfully and wantonly refusing to pay first-party benefits and relying on defenses it knew were untrue, and she asked for punitive damages in excess of $15,000.

On August 18, 1982, the trial court gave judgment for plaintiff on count I in the amount of $33,352 for unpaid benefits, and treble damages in the amount of $100,056 on count II. Additionally, it granted interest on the unpaid benefits of $5,530 and on the treble damages of $23,272. Plaintiff was also granted $1,000 as attorney fees under section 155.

What plaintiff seeks to do is to punish defendant twice for the same wilful and wrongful refusal to pay benefits. The award of treble damages constituted punishment of defendant for its refusal to pay. (*People ex rel. Tyrone C. Fahner v. Climatemp, Inc.* (1981), 101 Ill. App. 3d 1077, 428 N.E.2d 1096.) In our opinion, the trial court properly dismissed count III of plaintiff's amended complaint.

■ We find no merit in plaintiff's contention that section 155 is unconstitutional. Plaintiff claims a constitutional right to seek puni-

tive damages, and she suggests that the statute violates equal protection by distinguishing between first- and third-party claimants. As stated above, plaintiff is not entitled to a double recovery of punitive damages. Even if we accept plaintiff's argument that the statute distinguished between first- and third-party claimants, if there is a reasonable basis for differentiating between the class to which the law is applicable and the class to which it is not, the legislature may constitutionally classify persons and objects for the purpose of legislative regulation or control, and may pass laws applicable only to such persons or objects. (*Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 311, 319 N.E.2d 782, 785.) A statute is presumed to be valid, and the burden is upon the party challenging the statute to establish its constitutional invalidity. (*Jaris v. Public School Teachers' Pension & Retirement Fund* (1974), 58 Ill. 2d 15, 19, 317 N.E.2d 51, 54.) In our opinion, plaintiff has not met her burden of demonstrating that section 155 is unconstitutional.

DISMISSAL OF COUNTS V AND VII

Plaintiff next contends that the trial court erred in dismissing count V, the amended count V, and count VII of her complaint. In counts V and VII, plaintiff alleged the following: that Allstate advertisements represented that insureds would be promptly and adequately paid regardless of fault; that these advertisements emphasized Allstate's fiduciary relationship with its insured; that she had a right to rely on defendant's representations that a fiduciary relationship existed between her and defendant; that defendant never intended to pay her total policy benefits; and that as a result of her reliance she suffered actual damages in the amount of medical and lost income benefits.

Plaintiff claims that count V stated a cause of action for actual fraud and count VII stated a cause of action for constructive fraud. Plaintiff argues that she can infer that the advertisements were false when made because of Allstate's subsequent bad faith conduct. She also argues that her allegations that defendant tried to force a lump sum settlement that would have enriched it, contravening Illinois public policy and breaching its fiduciary duty, sufficiently alleged constructive fraud.

To state a cause of action of common law fraud, the party must allege that the statement made was of material fact as opposed to opinion; that it was untrue; that the party making the statement knew or believed it to be untrue; that the opposing party believed and relied on it and had a right to do so; that the statement was made for

the purpose of inducing the other party to act; and that the other party's reliance thereon led to his injury. (*Younger v. Revelle* (1979), 78 Ill. App. 3d 1, 4, 397 N.E.2d 221, 223.) Constructive fraud is defined as any act, statement or omission which amounts to positive fraud or which is construed as a fraud by the courts because of its detrimental effect upon public interests and public or private confidence. It requires neither actual dishonesty nor intent to deceive, being a breach of legal or equitable duty which, irrespective of the moral guilt of the wrongdoer, the law declares fraudulent because of its tendency to deceive others. *In re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 568, 378 N.E.2d 1345, 1349.

■ Applying these principles, we hold that allegations in plaintiff's complaint are insufficient to state a cause of action for fraud. The factual allegations do not show that when Allstate disseminated its advertisements for a no-fault automobile insurance plan it knew or believed that it would not pay the total amount of benefits to which an insured might be entitled. If we can infer, as plaintiff suggests, an intent to defraud by defendant's refusal to pay after April 1973, we can infer an intent not to defraud by defendant's payment of benefits for over a year after Pinson's accident. Further, even if we assume that plaintiff sufficiently alleged a cause of action for fraud, at trial she did not establish fraud by clear and convincing evidence. At best, she established the existence of a broken promise, not a deliberate scheme not to pay full benefits (*Younger v. Revelle* (1979), 78 Ill. App. 3d 1, 5, 397 N.E.2d 221, 224.) Finally, we note that plaintiff was awarded the amount of her unpaid benefits—actual damages—and treble that amount, with interest. We conclude that the trial court did not commit reversible error in dismissing counts V and VII of plaintiff's complaint.

Jury Instructions

■ Next, plaintiff argues that the trial court erred in allowing and refusing certain jury instructions. Defendant was allowed to tender several instructions which used the phrase, "actual and proximate cause." Plaintiff objects to the following instructions:

"The plaintiff has the burden of proving each of the following propositions:

\* \* \*

Fourth, that defendant's conduct was the actual and proximate cause of the severe emotional distress claimed by the plaintiff.

A plaintiff is entitled to recover damages for severe emo-

tional distress if such severe emotional distress was actually and proximately caused by the extreme and outrageous conduct of defendant, done either with the intent to cause emotional distress or with a reckless disregard of the probability of causing such distress.

When I use the expression 'actual and proximate cause,' I mean a cause which, in natural or probable sequence, produced the injury complained of, and which, in fact, caused the injury complained of."

Plaintiff claims that under her theory of liability arising from defendant's reckless conduct these instructions improperly required her to meet a higher burden of proof than the civil standard of a mere preponderance of the evidence. According to plaintiff, the instructions add an additional element to her *prima facie* case—actual causation. The definition of actual cause is so misleading and confusing that it holds plaintiff to a more stringent burden of proof. No Illinois Pattern Jury Instruction refers to or defines actual cause and no Illinois court had defined actual cause in relation to intentional infliction of emotional distress. Since conflicting evidence was presented with regard to the cause of Pinson's condition, plaintiff reasons it was improper to instruct the jury on the last instruction, the short form proximate cause instruction. Instead, the long form instruction should have been given. Additionally, use of the short form clouded the issue as to which injury the instruction referred—the initial head injury or the aggravation and deterioration of that condition. The long form takes into account a pre-existing condition and provides as follows:

"When I use the expression 'proximate cause,' I mean any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

Plaintiff contends that these instructions were further confused by the trial court's refusal to instruct the jury according to her proposed instruction as follows:

"The fact that an insured person has a pre-existing condition or disability is not a defense to payment of benefits under this insurance policy."

Although the Illinois Pattern Jury Instructions use the term, "proximate cause" rather than "actual and proximate cause," Illinois courts have used the latter term to describe the causation element of the tort of intentional infliction of mental distress (*Palmateer v. Inter-*

*national Harvester Co.* (1980), 85 Ill. App. 3d 50, 53, 406 N.E.2d 595, 598, *modified* (1981), 85 Ill. 2d 124, 421 N.E.2d 876; *Farnor v. Irmco Corp.* (1979), 73 Ill. App. 3d 851, 854, 392 N.E.2d 591, 595.) In our opinion, the instructions complained of do not misstate Illinois law on mental distress.

■ Plaintiff also objects to defendant's instruction on the elements of the tort of intentional infliction of mental distress which provides as follows:

> "The emotional distress suffered must be severe. Although such things as fright, horror, grief, shame, humiliation and worry may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not sufficient. In order to be 'severe,' the distress must be of such intensity and duration that no reasonable person could be expected to endure it."

Plaintiff contends that this instruction is negative and biased against her. She claims that it is misleading and confusing, and incorrectly states an element of the tort of intentional infliction of emotional distress. The instruction delineates aspects of things that do not constitute the tort rather than defining the tort. The instruction suggests that both intensity and duration must be present to a substantial degree to be actionable and that the distress must be constant and long-lasting. It also suggests that the mental conditions listed will never be actionable, although they are if the requisite degree of severity is shown.

The language in this last instruction was taken from our supreme court's opinion, *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767, which quoted comment j to the Restatement (Second) of Torts, section 46 (1965). We hold that the instruction is neither misleading nor confusing. Moreover, where appellant does not argue that the verdict was against the manifest weight of the evidence, but that errors in admitting evidence and giving jury instructions denied him a fair trial, the ultimate question confronting the reviewing court is whether there is a reasonable basis for the conclusion that, but for the errors the verdict might have been different. (*Moore & Co. v. Champaign National Bank* (1957), 13 Ill. App. 2d 232, 244, 141 N.E.2d 97, 104.) In our opinion, plaintiff was not prejudiced by the instructions. The jury heard the testimony of many witnesses and examined numerous documents. Plaintiff's expert witnesses claimed that Pinson's deterioration was caused by Allstate's handling of her claim. Despite voluminous evidence submitted on plaintiff's behalf, the jury rejected her claim. We cannot say that but for the alleged errors the verdict would have been in plaintiff's favor. Therefore, we hold

that the trial court committed no reversible error with respect to tendering or refusing certain jury instructions.

IMPEACHMENT OF VERDICT

■■ ■ Plaintiff attempts to impeach the jury verdict by submitting an affidavit by a juror who claimed that Robert Foss, an alternate, volunteered himself as the jury foreman. She objected, but Foss was selected after an election. Foss informed the jurors that he was going to allow them one hour to reach a verdict; that there was only one issue to be decided and he wanted to cut all the "legalese" and "medicalese" and get down to basics. Foss insisted that the standard of proof was beyond a reasonable doubt. During deliberations, he walked around the room in a frustrated manner and hit the door—conduct which was intimidating. The juror said she signed the verdict in defendant's favor only because of the harassing and intimidating behavior of Foss, and that when the judge asked her whether she adhered to the verdict she did not understand that she could disagree with the verdict form she had just signed. Plaintiff argues that Foss violated the oath he took when he was selected as an alternate that he would follow the law and uphold our legal system.

We disagree with plaintiff's contention that she is entitled to a new trial on the basis of the juror's affidavit. Testimony or affidavits of jurors cannot be used to show that the jury misunderstood the instructions or the law, the effect of a particular finding, or of their verdict. The meaning and effect of the verdict must be judged from its terms alone. Hence, no statements by the jurors, either unanimously or individually, can be resorted to for explaining or changing its meaning or legal effect. (*Chalmers v. City of Chicago* (1982), 88 Ill. 2d 532, 539-40, 431 N.E.2d 361, 365.) We hold that the trial court properly denied plaintiff's motion for a new trial predicated upon the affidavit of the juror.

ATTORNEY FEES

■■ On April 19, 1982, plaintiff's attorney, Philip Maher, filed an amended fee petition asking a judgment of $240,468 for hours totaling 1,923.75. In support of his petition, Maher submitted a record of time expended on the contractual aspects of the case. The record was constructed by reviewing each document in Pinson's case and assigning the amount of time necessary to create the work product.

On June 11, 1982, a hearing was held on the fee petition. Attorney Maher testified that he was licensed to practice law in 1970. He worked for two years for an insurance defense firm and then opened

his own practice. Most of his practice was in the area of tort litigation. He did not usually keep time records because most of his cases are taken on a contingent fee basis. His present billing rate is $125 per hour.

Attorney Maher entered into a contingent fee contract with plaintiff for one-third of the amount recovered from defendant. At the hearing, he asked for $232,625, that is, 1,861 hours at the hourly rate of $125. He wanted to be compensated at his current hourly rate because of the loss of use of funds he would have had had they been paid when service was rendered.

Maurice McCarthy and Jay Judge, attorneys, testified as expert witnesses. Attorney McCarthy stated that the amount of time expended on the case was reasonable, and that 433 hours for the appeal was probably low. Attorney Judge testified that the time allocated for preparing documents was reasonable.

Defendant called Sidney Karasik, an attorney, as an expert witness. In Karasik's opinion, the 433 hours for the appeal was excessive.

On August 19, 1982, the trial court entered an order granting attorney fees of $1,000 to Maher, under section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1975, ch. 73, par. 767). The judge found that the amount of fees recoverable under the contract was limited to the one-third contingency fee contract entered into between Maher and plaintiff. He denied plaintiff's petition that attorney fees be awarded on an hourly basis and denied her motion to include the lode star effect and multiplier on that petition. Plaintiff appeals from this order.

Plaintiff raises three issues with respect to attorney fees: (1) whether the trial court erred in limiting the amount of attorney fees to the amount which would be awardable under a standard contingent fee contract; (2) whether it erred in denying her petition that fees be awarded on an hourly basis; and (3) whether it erred in failing to allow a weighted multiplier to be used in computing fees.

In our opinion, this case must be reversed and remanded on the issue of attorney fees. Plaintiff's attorney has pursued for almost 10 years a claim which was initially worth only about $20,000 for the breach of contract. Although the jury found Allstate not guilty of intentional infliction of mental distress under count IV, the trial court found Allstate guilty of wilful breach of its contractual duty to its insured under counts I and II. In our opinion, the trial court should have considered the amount of time which was reasonably expended in the prosecution of plaintiff's claim and the appropriate amount of attorney fees to be assessed against defendant. Therefore, we remand

this cause to the trial court for a determination of the reasonableness of the amount requested by plaintiff in her petition for attorney fees.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part and remanded, with directions.

Affirmed in part and reversed in part and remanded.

LINN, P.J., and ROMITI, J., concur.