Affirmed and Opinion filed October 20, 2005









Affirmed and Opinion filed October 20, 2005.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-01208-CV

_________

 

MICHAEL
J. REARDON, ALBERT E. RAIZNER, JOHN ABUKHALIL, RIGHARD A. GOLDFARB, MILTON
NIRKEN, OSAMA MIKHAIL, WELDON GUEST, MORDECHAJ BLANKFELD, 

JAMES T. FOX, NORMAN RAPPAPORT, MARK BERGER, CAROL SUE FINKELSTEIN,
GERGORIO CASAR, RANDOLPH W. EVANS, MARTIN BARRASH, 

RICHARD M. BARRETT, M.D., P.A., DANIEL BARRETT, CYNTHIA A. BARRETT, 

ROBERT GORDON, AS TRUSTEE OF THE ALAN J. AND SHERRI GORDON EISENMAN
FAMILY TRUST, LARRY I. LIPSHULTZ, GOLDFAM, LTD., WILLIAM LIPSKY, TOBIAS SAMO,
GENE LANDON, MICHAEL MUNDAY, DEBORAH BRAND-FAINSTEIN, HAROLD L. HARRIS, 

GEOFFREY D. HARRIS, ADRIENNE HARRIS, RALPH G. HARRIS, MAZEL, INC., 

SHELDON HARRIS, HARVEY FUSON, RICHARD D. KLAUSMEIER AND KAY L.
KLAUSMEIER, AS TRUSTEES OF THE R.D. & K.L. KLAUSMEIER TRUST, RICHARD D.
KLAUSMEIER, RICHARD H. STEIN, EDGAR GOLDBERG, BOGUSLAW GODLEWSKI, 

CHRISTOPHER GODLEWSKI, RONALD GOLDEN, JAMES ALEXANDER, 

ROBERT K. ZURAWIN, MOHAMED O. JEROUDI, AND THOMAS J. MIMS, Appellants

 

V.

 

LIGHTPATH
TECHNOLOGIES, INC. AND 

D.H. BLAIR INVESTMENT BANKING CORP., Appellees

________________________________________________________________________

 

On Appeal from the 113th District Court

Harris County,
Texas

Trial Court Cause No. 00‑29461

________________________________________________________________________

 

O P I N I O N








In this complex securities fraud
case, forty-five plaintiffs appeal from an adverse summary judgment.  Appellants, shareholders in a technology
company, brought suit against the company and others asserting a number of
fraud-based claims, including common law fraud, statutory fraud under section
27.01 of the Texas Business and Commerce Code, securities fraud under the Texas
Securities Act, and negligent misrepresentation, as well as a claim for breach
of fiduciary duty.  The trial court
disposed of all claims by granting summary judgment on both traditional and
no-evidence grounds.  We affirm.

I. 
Introduction

The shareholders challenge the
trial court=s disposition of their
fraud-based claims.  They assert that the
company=s
representations fraudulently induced them to consent to a transaction that
dispossessed them of a part of their ownership in the company in exchange for a
type of share, Athe E
share,@ the
value of which depended upon the company=s
achievement of certain milestones based on the company=s stock
price and pretax income.  The
shareholders allege that the company misrepresented and failed to disclose
material facts that would have shown the shareholders that the E shares were
highly unlikely to convert to shares of Class A common stock because LightPath
was highly unlikely to achieve the necessary milestones.  The trial court found, among other things,
that the shareholders failed to produce evidence that they suffered
damages.  We, too, conclude there is no
genuine issue of material fact as to whether the shareholders suffered
recoverable damages. 

II.  Factual and Procedural Background








Appellants/plaintiffs Michael J.
Reardon, Albert E.
Raizner, John Abukhalil, Richard A. Goldfarb, Milton Nirken, Osama Mikhail,
Weldon Guest, Mordechaj Blankfeld, James T. Fox, Norman Rappaport, Mark Berger,
Carol Sue Finkelstein, Gregorio Casar, Randolph W. Evans, Martin Barrash,
Richard M. Barrett, M.D., P.A., Daniel Barrett, Cynthia A. Barrett, Robert
Gordon, as trustee of the Alan J. and Sherri Gordon Eisenman Family Trust,
Larry I. Lipshultz, Goldfam, Ltd., William Lipsky, Tobias Samo, Gene Landon,
Michael Munday, Deborah Brand-Fainstein, Harold L. Harris, Geoffrey D. Harris,
Adrienne Harris, Ralph G. Harris, Mazel, Inc., Sheldon Harris, Harvey Fuson,
Richrd D. Klausmeier and Kay L. Klausmeier, as trustees of the R.D. &
K.L.  Klausmeier Trust, Richard D.
Klausmeier, Richard H. Stein, Edgar Goldberg, Boguslaw Godlewski, Christopher
Godlewski, Ronald Golden, James Alexander, Robert K. Zurawin, Mohamed O.
Jeroudi, and Thomas J. Mims (referred to collectively hereinafter as the
AInvestors@) are
shareholders in appellee/defendant LightPath Technologies, Inc. (hereinafter ALightPath@), whose
written materials describe it as a manufacturer and marketer of optical glass
and other products used in the telecommunications industry.  Appellee/defendant D.H. Blair Investment Banking
Corporation (AD.H. Blair@) is a
New York investment banking firm that served as the underwriter for the
recapitalization and initial public offering (AIPO@) at
issue in this case.








In the 1980s, Leslie Danziger
created a type of optical glass she named AGradium.@  This glass, Danziger believed, would make it
possible to do with one lens, or fewer lenses, what it takes conventional glass
multiple lenses to do.  Danziger founded
LightPath, a company incorporated in Delaware, to design, develop, manufacture,
and market Gradium to the optics
and related industries.  However, Gradium was a new product that
presented many challenges, one of which was that it had never been produced
commercially.  From 1985 through 1994,
LightPath solicited private funding from investors for research and
development.  During this period,
investors were advised that LightPath had limited capitalization and
significant debts, and that the commercialization of LightPath=s
technology was a Ahighly
speculative venture.@  By 1994, it became apparent to the company
that it could not survive without a major infusion of capital.  At that time, LightPath had generated no
significant revenue.  Despite continual
undercapitalization, the company made progress with its technology.  In 1994, LightPath brought a single type of
lens to market.  Anticipating a
production scale-up, LightPath sought to expand the number and type of lenses
the company was creating.  

To generate much-needed capital,
LightPath pursued the idea of an IPO with a number of investment banking firms,
ultimately settling on D.H. Blair.  In
August 1995, D.H. Blair executed a letter of intent to underwrite an IPO for
LightPath.  D.H. Blair proposed an
offering that initially would raise $8 million through the sale of stock and up
to an additional $63 million through future warrant sales. 

Recapitalization
Plan

As a condition of the IPO,
LightPath sought to recapitalize.  In
proposing this transaction to its existing shareholders, LightPath presented a
two-part recapitalization plan in a proxy statement seeking approval of the
transaction:

(1)       Reverse Stock Split.  The number of shares of existing LightPath
stock (including those allocated for debt conversion and stock options) would
be reduced through a 1-to-5.5 reverse stock split, which would effectively
reduce the number of outstanding shares from 5.5 million to 1 million.[1]  If a majority of LightPath shareholders
approved the reverse split, Class A common stock (AA shares@) would be issued to effect
this stock split.

(2)       E Shares.  LightPath would distribute, as a Anon-taxable stock
dividend,@ escrow sharesCcalled AE shares@Cto pre-IPO
shareholders.  All holders of A shares
were to receive four E shares for every post-split A share.  The E shares would retain voting power, but
they would be non-tradeable unless and until LightPath reached certain
performance milestones.  These milestones
would be triggered should LightPath achieve certain targets for the price of it=s a shares and/or for its
pretax income.  The E shares would be
redeemed for nominal value unless they converted to A shares by 2000.








LightPath, through Danziger, who
was then its President and Chairman of the Board, told the Investors that the
company could not effectively market and sell Gradium
products or fund the planned expansion of its manufacturing operations without
the IPO.  In September 1995, a majority
of shareholders approved the proposed recapitalization plan, and the reverse
stock split was accomplished.  Every 5.5
shares of Class A stock were redeemed for one share, and LightPath distributed
E shares to its existing shareholders. 

The IPO offered 1.6 million
units.  A single unit in the IPO was sold
for $5.00. Purchasers received one A share and two warrants per unit, and all
1.6 million units, plus 240,000 in over allotment, were sold.  The IPO raised $9.2 million in capital for LightPath.  After the IPO, shareholders exercised their
warrants, and the IPO raised more than $65 million.  Despite the success of the IPO, LightPath did
not achieve the E share financial milestones set forth in the proxy
statement.  Consequently, the E shares
did not convert to A shares.  The
Investors filed suit in June 2000.

The
Investors= Claims

The Investors asserted claims of
fraud, statutory fraud under Section 27.01 of the Texas Business and Commerce
Act, securities fraud under the Texas Securities Act, negligent
misrepresentation, and breach of fiduciary duty.  The Investors alleged that LightPath
misrepresented and failed to disclose material information that the Investors
would have found important in approving the recapitalization and IPO
transaction, fraudulently inducing the Investors to consent to a transaction
that decreased their interest in LightPath. 
The Investors assert that LightPath misrepresented and failed to
disclose facts that would have shown the Investors that the E shares were
highly unlikely to convert to A shares because LightPath was highly unlikely to
achieve the necessary milestones.  The
Investors also alleged that LightPath made a material misrepresentation that
the post-IPO value of the E shares would be five dollars per share. 








In addition to suing LightPath,
the Investors also sued D.H. Blair, Danziger, Donald Lawson, LightPath=s former
President and Chief Executive Officer, and Milton Klein, a former director of
LightPath.  D.H. Blair, Danziger, and
Lawson all filed special appearances, which the trial court denied.  On interlocutory appeal, this court affirmed
the trial court=s order
denying Danziger=s and
Lawson=s special
appearances, but reversed the trial court=s order
denying D.H. Blair=s special
appearance.  See D.H. Blair Inv.
Banking Corp. v. Reardon, 97 S.W.3d 269 (Tex. App.CHouston
[14th Dist.] 2002, pet. dism=d
w.o.j.). The Investors subsequently nonsuited their claims against Danziger,
Lawson, and Klein.  Under this court=s mandate
from the interlocutory appeal, the trial court dismissed the claims against
D.H. Blair, leaving only the Investors= claims
against LightPath.

LightPath=s Motions
for Summary Judgment

LightPath moved for traditional
and no-evidence summary judgment, asserting the following grounds:

!         LightPath did not make any material misrepresentations or
omissions.

!         The Texas Securities Act does not apply because any alleged
material misrepresentations or omissions by LightPath did not occur in the
context of a sale of securities.

!         The Investors cannot recover because they have suffered no
damages.

!         LightPath did not owe the Investors a fiduciary duty.  

 

The trial court granted this motion and
rendered a final judgment dismissing all of the Investors= claims
against LightPath.  The trial court
specifically based its judgment on all of the above-stated summary-judgment
grounds.

III.  Issues Presented

The Investors raise the following
issues for appellate review:








Misrepresentation

!                  
Did the trial court err in granting summary judgment in favor of
LightPath on the ground that LightPath conclusively disproved the making of a
material misrepresentation or omission?

!                  
Did the trial court err in granting summary judgment in favor of LightPath
on the ground that the Investors failed to produce evidence that LightPath made
a material misrepresentation or omission?

Texas Securities Act

!                  
Did the trial court err in granting summary judgment in favor of
LightPath against the Investors= securities fraud claim on the ground that
LightPath conclusively disproved that an alleged material misrepresentation or
omission occurred in the context of a sale of securities?

!                  
Did the trial court err in granting summary judgment in favor of
LightPath against the Investors= securities fraud claim on the ground that the
Investors failed to produce evidence that an alleged material misrepresentation
or omission occurred in the context of a sale of securities?

Damages

!                  
Did the trial court err in granting summary judgment in favor of
LightPath on the ground that LightPath conclusively disproved that the
Investors suffered damages?

!                  
Did the trial court err in granting summary judgment in favor of
LightPath on the ground that the Investors failed to produce evidence that they
suffered damages?

Personal Jurisdiction

!                  
Did the trial court properly conclude that it could exercise personal
jurisdiction over D.H. Blair?

The Investors do not challenge the trial
court=s
dismissal of their breach-of-fiduciary-duty claim.

IV. 
Standards of Review








In
reviewing a traditional motion for summary judgment, we take as true all
evidence favorable to the nonmovant, and we make all reasonable inferences in
the nonmovant=s favor.  Dolcefino v. Randolph, 19 S.W.3d 906,
916 (Tex. App.CHouston [14th Dist.] 2000, pet.
denied).  If the movant=s motion
and summary-judgment evidence facially establish its right to judgment as a
matter of law, the burden shifts to the nonmovant to raise a genuine, material
fact issue sufficient to defeat summary judgment.  Id.

In reviewing a no-evidence motion
for summary judgment, we ascertain whether the nonmovant pointed out
summary-judgment evidence of probative force to raise a genuine issue of fact
as to the essential elements attacked in the no-evidence motion.  Id.; Johnson v. Brewer & Pritchard,
P.C., 73 S.W.3d 193, 206B08 (Tex.
2002).  We take as true all evidence
favorable to the nonmovant, and we make all reasonable inferences therefrom in
the nonmovant=s favor.  Dolcefino, 19 S.W.3d at 916.  A no-evidence motion for summary judgment
must be granted if the party opposing the motion does not respond with
competent summary-judgment evidence that raises a genuine issue of material
fact.  Id. at 917.  

V.  Analysis

If the trial court was correct in
its determination that summary judgment on all of the Investors= claims
is appropriate because the Investors suffered no damages, then it would not be
necessary for this court to reach most of the Investors= other
issues.  Therefore, we will focus on the
issue of whether the evidence raises a genuine issue of material fact regarding
the Investors= alleged damages, after first
addressing a liability issue.

A.        Is there a genuine issue of material
fact as to whether LightPath represented that the post-IPO value of the E
shares would be five dollars per share?

The Investors assert that there
is a genuine issue of material fact as to whether LightPath represented that
the post-IPO value of the E shares would be five dollars per share. The Investors
base this argument on the proxy solicitation letter that LightPath sent the
Investors regarding the IPO (AProxy
Letter@) and
alleged admissions by Danziger at her deposition that LightPath made such a
representation. The Proxy Letter states:








We are pleased to inform
you that LightPath has entered into a Letter of Intent for a Afirm commitment@ underwriting with New
York City-based D.H. Blair Investment Banking Corporation for a public offering
of LightPath Units. Each Unit will consist of one share of Class A Common Stock
and two warrants, as explained in detail in the enclosed Notice and Proxy
Statement. . . .

The Board of Directors is
very enthusiastic about this proposed [IPO]. The deal structure as proposed by
the Letter of Intent, which is described in the enclosed Proxy Statement, with
A shares and E shares and a $5.00 Unit Offering price, is not unusual for this
type of Aearly stage company@ financing. The Board is
pleased with the small reduction in the aggregate number of shares held by
current LightPath shareholders (10% from 5,500,000 to 5,000,000) and that,
following the Offering and until warrants are exercised, the current shareholders
as a group retain voting control over the affairs of our Company. . .

. . .

The structure of this
financing, as proposed by the Letter of Intent, is detailed in the enclosed
Notice and Proxy Statement.  The
following summarizes the terms:

1.) 1.6 Million Units,
consisting of one share of Class A Common Stock and two warrants, will be
offered for a Unit price of $5.00 for a total of $8,000,000, with an option to
the underwriter to sell an over-allotment of up to an additional 15% of the
Units offered, or an additional 240,000 Units. 
If the over-allotment is sold in full, the gross proceeds will be
$9,200,000.  Based on the $5.00 Unit
price, the post-IPO market valuation is estimated at $33 - 34.2 Million
depending upon the sale of the over-allotment.

. . .

6.)  The Class E-1, E-2, and E-3 shares will
automatically convert to Class A Common shares (on a one-for-one basis) upon
the achievement by the Company of specific performance milestones (described in
the enclosed Proxy Statement) which have been set by the underwriter and agreed
to by the Company; they are based on discounted net profit targets from our
Business Plan.  The E shares may not be
sold, assigned or transferred until converted to A shares.  If certain milestones are not met, the
corresponding Class E stock is subject to redemption in September, 2000.

 

The proxy statement enclosed with the proxy
letter accurately stated the milestones that had to be met before any of the E
shares would convert into A shares.  It
also stated that on September 30, 2000, all E shares not previously converted
into A shares would be redeemed by LightPath for $.00001 per share.








After reviewing the record under
the applicable standard of review, we conclude that there is no genuine issue
of material fact as to whether the Proxy Letter contains a representation that
E shares would have a five dollar per share value after the IPO.  The Proxy Letter does not contain such a
representation.  The Proxy Letter states
that the units to be sold in the IPO will consist of one A share and two
warrants to purchase A shares, priced at five dollars per unit.  The Proxy Letter states that the anticipated
IPO would generate $8 million to $9.2 million depending on sale of the over-allotment.  In the sentence that the Investors claim
constitutes a representation that the E shares would have a value of five
dollars per share, the Proxy Letter states that, based on an IPO price of five
dollars per unit, Athe
post-IPO market valuation is estimated at $33 B 34.2
Million depending upon the sale of the over-allotment.@  As a matter of law, this statement is not a
representation that the E shares will be worth five dollars per share.  The Proxy Letter does not state a value for
the A shares or for the E shares.  The
Proxy Letter does not state who estimated Athe
post-IPO market valuation@ of LightPath
to be $33 B 34.2 million.  Using a five dollar per unit price, the sale
of 1.6 million units would generate $8 million. 
The underwriter also had an option to sell an over-allotment of up to
240,000 more units, which would generate up to an additional $1.2 million.  Even if one subtracts from this range the
range of amounts that might be raised in the IPO, that would only indicate
that, other than this amount, Athe
post-IPO market valuation@ is
estimated to be $25 million.  The Proxy
Letter and enclosed Proxy Statement state that the E shares may not be sold or
assigned until converted into A shares and that they will not convert to A shares
unless specific milestones are achieved. 
As a matter of law, the Proxy Letter does not contain a representation
that the E shares would be worth five dollars a share. 








The Investors assert that
Danziger admitted at her deposition that LightPath made such a
representation.  At the time of her
depositon, Danziger was no longer an officer of LightPath, although she was a
director.  First, the testimony in question
consists of Danziger=s answers
to questions from the Investors= counsel
regarding the Proxy Letter.  Danziger
does not testify regarding any allegation of the post-IPO value of the E shares
not contained in the Proxy Letter. 
Second, Danziger states that she is not sure how the calculation of $33 B 34.2
million was done and that she does not remember the basis for it.  Danziger also states that the E shares were
clearly not tradeable.  In a series of
leading questions, counsel for the Investors elicited affirmative answers from
Danziger as to the following propositions:

!         The old shareholders in the reverse stock split were going
to get one million A shares at five dollars per share, which totals $5 million.

!         $5 million of the $33 million valuation comes from the value
of the old shareholders= stock.

!         $8 million would be generated from the IPO.

!         Subtracting $5 million and $8 million from $33 million
leaves $20 million, which divided by four million E shares is five dollars per
E share.

 








Danziger
then testified, in answer to leading questions, that the Proxy Letter stated
that the E shares would have a value of five dollars per share.  Although Danziger signed the Proxy Letter,
her testimony more than five years later does not add words to the
document.  The Investors base their
argument on deductions and inferences from the $33 B 34.2
million market valuation mentioned in the letter; however, at her deposition,
Danziger stated she did not remember the basis of the calculation of $33 B 34.2
million.  Furthermore, her admissions are
not binding on LightPath as a judicial admission, and they are conclusory
statements about the Proxy Letter that do not raise a genuine issue of material
fact.  See Coastal Transport Co., Inc.
v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 232 (Tex. 2004)
(stating that even unobjected-to conclusory testimony does not raise a fact
issue); United States Fid. & Guar. Co. v. Carr, 242 S.W.2d 224, 228
(Tex. Civ. App.CSan
Antonio 1951, writ ref=d)
(explaining that mere testimony is not intended as a waiver, stipulation, or
judicial admission and that testimony is not a judicial admission).  Therefore, the trial court correctly granted
summary judgment as to the alleged misrepresentation by LightPath in the Proxy
Letter that the E shares would have a post-IPO value of five dollars per share.[2]  In addressing the Investors=
arguments that they raised a genuine issue of material fact as to damages, we
presume for the sake of argument that they raised a genuine issue of material
fact as to their other allegations of fraud.

B.        Is there a genuine issue of material fact regarding the
Investors= alleged rescission
damages based on the testimony of Otto Meyers?

The Investors also assert that the deposition
testimony of their expert Otto Meyers raises a genuine issue of material fact
as to their alleged damages under the remedy of rescission.  In his deposition, Meyers testified as
follows:

!         His calculations presume that there is a legal remedy of
rescission under which the Investors would receive the payment for the number
of E shares they tendered to LightPath based on the closing price of LightPath
A shares the day before the tender.

!         Under this model, Meyers testified that the holders of
483,593 E shares that were tendered to LightPath on September 27, 2000 would be
entitled to rescission damages of $30,424,045 based on the closing price for A
shares the previous day of $44.938 per share and based on an addition of 40
percent for attorney=s fees.  

!         Under this model, Meyers testified that the holders of
18,299 E shares that were tendered to LightPath on February 22, 2001 would be
entitled to rescission damages of $ 458,061 based on the closing price for A
shares the previous day of $17.88 per share and based on an addition of 40
percent for attorney=s fees.[3]


!         The
Investors= aggregate rescission damages are
$30,882,105.








The remedy of rescission is supposed to return the
Investors to their position before the alleged fraud.  See Texas Capital Sec., Inc. v. Sandefer, 58 S.W.3d 760, 773B74 (Tex. App.CHouston [1st Dist.] 2001, pet.
denied).  Meyers does not calculate or
otherwise account for the consideration, if any, that the Investors gave to
receive the E shares.[4]  We conclude that, as a matter of law, the
damages calculated by Meyers would not return the Investors to the positions
they held before the IPO.  Therefore,
Meyers= testimony does not raise a genuine
issue of material fact as to the Investors= alleged damages under a rescission
remedy.[5]

C.        Is there a genuine issue of material fact regarding the
Investors= alleged rescission
damages based on the testimony of William Nicoletti?

The Investors also assert that the deposition
testimony of their expert William Nicoletti raises a genuine issue of material
fact as to their alleged damages under the remedy of rescission.  In his deposition, Nicoletti testified as
follows:

!         If the LightPath shareholders had known that there was no
real chance that the E shares would convert or that D.H. Blair had valued the
business at $5 million before the IPO, then they would not have approved the
proposed recapitalization involving the IPO.








!         If the LightPath shareholders failed to approve this
transaction, then they would have renegotiated the terms of LightPath=s recapitalization with
LightPath, and then LightPath would have to have renegotiated with D.H. Blair.

 

!         Nicoletti does not know that it would have been practical
for LightPath to have negotiated with all of its shareholders, but he believes
LightPath would have negotiated with some of the influential shareholders.  Other than Dr. Michael Reardon, Nicoletti does
not know who the influential shareholders of LightPath were, but he knows that
LightPath knew who they were.

!         It is reasonable to assume that an appropriate compromise in
this renegotiation would have been for LightPath and D.H. Blair to agree that
one Class A warrant would be issued for each A share held prior to the IPO.

!         Nicoletti bases his damage calculation on the presumption
that each Investor would have received a Class A warrant in the renegotiated
IPO.  Then, he calculates the value of
that warrant by presuming that the Investors would have exercised the warrant
just before the redemption date of February 9, 2000, when LightPath A shares
were trading at $33 per share.  

!         Based on an exercise price of $6.50 per warrant, each
warrant holder would realize a profit of $26.50 per warrant, plus, under the
terms of the Class A warrant, they also would receive a Class B warrant.

!         Nicoletti presumes the Investors would have exercised their
Class B warrant just before the June 13, 2000 redemption date for these
warrants.

!         Under
this calculation, Nicoletti determined that each holder of an A share should be
awarded $50.25 based on the value of the Class A warrant that he believes they
would have received in the renegotiated 
transaction.








As noted, the remedy of rescission is supposed to
return the Investors to their position before the alleged fraud.  See Texas Capital Sec., Inc., 58 S.W.3d at 773B74. 
Nicoletti does not calculate or otherwise account for the consideration,
if any, that the Investors gave to receive the E shares. We conclude that, as a
matter of law, the damages calculated by Nicoletti would not return the
Investors to the positions they held before the IPO.  See id. 
Therefore, Nicoletti=s testimony does not raise a genuine issue of material fact
as to the Investors= alleged damages under a rescission remedy.

Furthermore, Nicoletti piles speculation upon speculation. He presumes
that the LightPath shareholders would have rejected the proposed IPO absent the
alleged fraud, yet he testified that, at the time of his deposition, he had not
yet talked to any LightPath shareholder or to any of the Investors.  There is no evidence in our record that
Nicoletti ever talked to any of the LightPath shareholders at any time.  Nicoletti also speculates that some of the
influential LightPath shareholders would have negotiated with LightPath for a
transaction involving the receipt of Class A warrants and that D.H. Blair would
have agreed.  Again, there is no evidence
that Nicoletti talked to any LightPath shareholder, and he testified that the
only influential shareholder he knew of was Dr. Michael Reardon.  Nicoletti continues his speculation by
presuming that, over a five-year period during which, under his analysis, the
Investors could have exercised their warrants, the Investors, in fact, would
have exercised their warrants at the end of this period in February 2000.  He further speculates that the Investors
would have exercised their Class B warrants in June 2000.  Nicoletti=s
testimony rests on one fragile assumption after another.  It would be speculative as a matter of law to award the
Investors the damages calculated by Nicoletti.[6]  See Formosa Plastics Corp. USA v. Presidio
Eng=rs and Contractors, Inc., 960 S.W.2d 41, 49B50 (Tex. 1998).








The
Investors also cite different calculations by Nicoletti of purported rescission
damages.  These calculations are
substantially similar to Meyers=s testimony.  They
presume that all of the Investors= E shares would have converted to A
shares and values these shares based on the date in 2000 on which the Investors
demanded rescission.  This testimony does
not raise a genuine issue of material fact for all of the reasons stated in
section V. B., above, as to Meyers=s testimony.

Nicoletti also testified regarding a damage
calculation based on the highest intermediate value of the A sharesC$65.31 in
the first quarter of 2000.  Nicoletti
himself testified that it would not be reasonable to presume that the Investors
would have exercised their warrants and then sold their A shares at the highest
price.  On appeal, the Investors do not
rely on this damage testimony, although they urge the applicability of the
highest intermediate value in an equitable rescission remedy.  To the extent the Investors rely on a
highest-intermediate-value theory as part of their alleged equitable rescission
remedy, there is no sound basis to apply such a theory.  The Texas cases cited by the Investors which allegedly apply
the Ahighest intermediate value@ theory of damages are conversion
cases and are not applicable to the facts of this case.  See Gallagher v. Jones, 129
U.S. 193, 200, 9 S. Ct. 335, 336, 32 L. Ed. 658 (1889) (holding that the
measure of damages action against a broker for conversion of his principal=s stocks is the highest intermediate
value reached by the stocks between the time of sale and a reasonable time
after the owner has received notice of it to enable him to replace the stocks);
Reed v. White, Weld & Co., Inc., 571 S.W.3d 395, 397B98 (Tex. Civ. App.CTexarkana 1978, no writ) (holding
that  damages for wrongful sale of stocks
or bonds is highest intermediate value of stock or bonds between time of its
conversion and reasonable time after owner has received notice of conversion to
enable him to replace stock).[7]
   








We have found no Texas case applying Ahighest intermediate value@ theory as part of a rescission
remedy in a securities fraud case.  The
federal securities fraud case that the Investors cite does not apply a Ahighest intermediate value@ theory; rather, it allows the jury
to determine a reasonable time in the future when the claimants
would have sold their stock, not necessarily the highest value of the
stock.  See Dupuy v. Dupuy, 551 F.2d 1005, 1024B25 (5th Cir. 1977) (holding that in a
Rule 10b-5 case, a defrauded seller of corporate stock may generally recover
difference between price for which he sold his stock and price he would have
received absent misrepresentation or omission; if the jury decides he would not
have consummated sale, it may then award difference between sale price and
value of stock at a reasonable time in the future).  In any event, in light of the Texas Supreme
Court=s analysis in Miga v. Jensen,
we decline to embrace the Ahighest intermediate value@ theory of rescission advocated by
the Investors.  See 96 S.W.3d 207,
213B17 (Tex. 2002).   

In Miga,
defendant Jensen gave his employee, plaintiff Miga, an option to buy stock
in Pacific Gateway Exchange (APGE@).  See id. at
209.  The relationship between Jensen and
Miga deteriorated, and Miga signed a Atermination agreement.@ 
Id.  For nine months after
his termination, Miga tried to exercise the PGE option.  Id.  Each
time, Jensen refused and stated that Miga had released the option.  See id. 
Miga then sued to recover for damages resulting from Jensen=s refusal to honor the option.  Id. 
Jensen argued that contract damages must be limited to the value of
the PGE stock at the time Miga Aresigned.@  Id.  The jury found for Miga on all issues and
awarded Miga Alost profits.@  The court of appeals upheld the Alost profits@ award, reasoning that the Texas
Supreme Court=s decisions in Randon v. Barton and
Calvit v. McFadden support measuring Miga=s damages as the option=s highest market value between the
date of the breach and trial because Miga could not easily obtain PGE stock
elsewhere at the time of the breach.  See Randon v. Barton, 4 Tex. 289,
293 (1849) (applying an exception to the general rule and allowing damages for
the highest value of the article between the time of trial and the time of
breach because the purchasers had paid the contract price in advance); Calvit
v. McFadden, 13 Tex. 324, 325B26 (1855) (applying the exception to
the general rule to the sale of personal property when the purchase price was
paid in advance).  








The
Texas Supreme Court rejected this position and found that the Randon damages
measure (assuming that it is viable today) was inapplicable to the facts in Miga.  See Miga, 96 S.W.3d at 215.   For example, Miga did not pay in advance for
his stock interest.  The Miga court
held that the value of stock should be measured at the time of breach, rather
than sometime in the future.  Id.  The Texas Supreme Court opined: 

It was far from certain in December 1994 that the value of the stock
would appreciate as it did. While Jensen ultimately benefitted from this
appreciation, he also assumed the risk that the investment would be lost, just
as any stockholder does.  To award Miga
damages based on the appreciated value of the stock would be to make him better
off than he would have been had the agreement been honored by giving him an
investment free of the risks other shareholders undertook.  More importantly, however, trying to
determine what part of the stock=s
appreciation Miga would have realized had he obtained the stock in December
1994 is to speculative. 

 

Id. at 216B17. 
Similarly, to award Investors the alleged Ahighest intermediate value@ of the E shares as if they had been
converted to A shares is too speculative.  See id. 
Nicolleti=s damage calculations based on stock prices in 2000 would
provide the Investors with the windfall yielded from a riskless investment in a
high-risk field.  See id.








In sum, we conclude that the Nicoletti evidence does not
raise a genuine issue of material fact as to the Investors= alleged damages.  The Investors= claims
for fraud, statutory fraud under Section 27.01 of the Texas Business and
Commerce Act, securities fraud under the Texas Securities Act,[8]
and negligent misrepresentation[9]
all have the essential element of damages, and LightPath attacked this
essential element in a no-evidence ground. 
After viewing the
evidence under the applicable standard of review, we conclude that the trial
court correctly determined that the summary-judgment evidence
does not raise a genuine issue of material fact as to this essential element of
damages.[10]  There can be no recovery for damages that are
speculative or conjectural. A.B.F. Freight Sys., Inc. v. Austrian Import
Serv., Inc., 798 S.W.2d 606, 615 (Tex. App.CDallas
1990, writ denied).  Ignoring the legally
insufficient damage testimony from Meyers and Nicoletti, there is no genuine
issue of material fact as to whether the Investors sustained damages.  See Cohen v. Arthur Andersen, L.L.P.,
106 S.W.3d 304, 305B07 (Tex.
App.CHouston
[1st Dist.] 2003, no pet.) (holding that trial court correctly granted summary
judgment based on no-evidence ground in fraud case).  Accordingly, we overrule the Investors= issue in
this regard, and we need not reach their other issues, except for the issue of
the trial court=s ability
to exercise personal jurisdiction over D.H. Blair.

D.        Have the Investors= waived their issue as to
the trial court=s ability to exercise
personal jurisdiction over D.H. Blair?

In their final issue, the
Investors assert that the trial court correctly denied the special appearance
of defendant D.H. Blair.  The Investors
note that this court already has held to the contrary in the prior
interlocutory appeal.  See D.H. Blair
Inv. Banking Corp, 97 S.W.3d at 278B79.  However, the Texas Supreme Court determined
that it did not have jurisdiction over that interlocutory appeal, and the
Investors want to preserve error in this court so that they can seek review of
this jurisdictional issue in the Texas Supreme Court following our decision in
this case.  








In
response, D.H. Blair argues that the Investors have waived their appellate
issue by failing to provide any argument or authorities.  See Tex.
R. App. 38.1(h).  The Investors,
however, already have briefed these very issues in their prior interlocutory
appeal involving the same parties and jurisdictional arguments.  Moreover, they assert that, for purposes of
economy, they have incorporated by reference their trial court briefing on this
issue.  The appellate record in this case
contains the jurisdictional briefing in the trial court, as well as this court=s mandate
and opinion from the prior interlocutory appeal, in which the Investors
provided argument and authorities on these jurisdictional issues.  We construe briefing rules reasonably yet
liberally, so that the right to appeal is not lost by imposing requirements not
absolutely necessary to effect the purpose of a rule.  See Republic Underwriters Ins. Co. v. Mex.
Tex Inc., 150 S.W.3d 423, 427 (Tex. 2004); Tex. Mission Ry. Co. v.
Bouchet, 963 S.W.2d 52, 54B55 (Tex.
1998).  Under the unusual circumstances
of this case and given that the Investors simply seek to preserve their ability
to seek review in the Texas Supreme Court, we conclude that the Young v.
Neatherlin case is not on point and that the Investors have not waived
their issue regarding the trial court=s ability
to exercise personal jurisdiction over D.H. Blair.  See 102 S.W.3d 415, 423 (Tex. App.CHouston
[14th Dist.] 2003, no pet.) (indicating that parties cannot incorporate by
reference briefing from another case into their appellate brief).  

Nevertheless,
because we conclude that this court=s prior
opinion as to this issue was not clearly erroneous, we overrule this issue
under the law-of-the-case doctrine.   See Briscoe v. Goodmark Corp., 102 S.W.3d
714, 716B17 (Tex.
2003). 

VI.  Conclusion








The trial
court correctly granted summary judgment as to the alleged misrepresentation by
LightPath in the Proxy Letter that the E shares would have a post-IPO value of
five dollars per share.  Therefore, that
alleged misrepresentation cannot provide a basis for the Investors= alleged
damages.  Under the applicable standard
of review, the damage evidence upon which the Investors rely is speculative,
conclusory, and does not raise a genuine issue of material fact as to the
essential element of the Investors= alleged
damages. Having concluded that the Investors did not establish a genuine issue
of material fact as to damages, we overrule the Investors= issue in
this regard.  Under the law-of-the-case
doctrine, we overrule the Investors= issue
regarding the trial court=s ability
to exercise personal jurisdiction over D.H. Blair.  Given these rulings, it is not necessary to
reach the Investors=
remaining issues.  We affirm the trial
court=s
judgment.

 

/s/        Kem Thompson Frost

Justice

 

Judgment rendered and Opinion filed October 20,
2005.

Panel consists of Justices Anderson, Hudson, and
Frost.

 

 











[1]  Following a
1-to-5.5 reverse stock split, a shareholder with ninety-nine  pre-split shares would have eighteen
post-split shares, but both her share of ownership of the company and the total
worth of her investment would remain the same. 
See Reiss v. Fin. Performance Corp., 764 N.E.2d 958, 960
(N.Y. 2001).  





[2]  Therefore, we
need not address the Investors= argument that the trial court erred in granting a
no-evidence summary judgment as to their damages based on their alleged
benefit-of-the-bargain damages arising from this alleged
misrepresentation.  





[3]  Our record
contains no affidavit or expert report from Meyers.





[4]  LightPath
argues the Investors gave no consideration; whereas, the Investors claim the
consideration was their consent to have their percentage ownership in LightPath
diluted by the IPO transaction.  We need
not address these arguments.





[5]  The Investors
do not assert that Meyers=s testimony raises a genuine issue of material fact as
to any alleged benefit-of-the-bargain damages; however, even if this argument
were before us, we would reject it.  It
would be speculative as a matter of law to award the Investors damages as if
all of their E shares had converted.  Formosa Plastics Corp. USA v. Presidio Eng=rs and Contractors, Inc., 960 S.W.2d 41, 49B50 (Tex.
1998).  The Investors do not allege that
LightPath induced them to approve the IPO transaction by representing that the
E shares were certain to convert to A shares. 
Rather, in their live petition they allege LightPath Arepresented that if, after the IPO, LightPath achieved
certain financially related milestones, the old shareholders would receive a
share of common stock for each E-share, on a one-to-one basis.@  The Investors
further allege LightPath represented that Athe E
shares, although contingent, had a real and certain value and were not just a
speculative gamble in the future.@  Although the Investors do allege that, after
the IPO had been consummated, Danziger told an E shareholder that the
milestones were sure to be met, this alleged statement could not have induced
any of the Investors to approve the transaction.  Although the Investors allege that LightPath
represented that the chances of conversion were much higher than LightPath
allegedly knew they were, a very high chance of conversion is not the same as a
certainty of conversion. Therefore, even under a benefit-of-the-bargain measure
of damages, it would be inappropriate to award the Investors damages as if all
of their E shares had converted to A shares.





[6]  The Investors
do not assert that Nicoletti=s testimony raises a genuine issue of material fact as
to any alleged benefit-of-the-bargain damages; however, even if this argument
were before us, we would reject it. Benefit-of-the-bargain damages seek to
compensate the defrauded party for the profits that would have been made if the
bargain had been performed as expected.  Formosa,
902 S.W.2d at 50.  There is no evidence
that LightPath represented to the Investors that they would receive warrants as
part of the IPO transaction. Therefore, Nicoletti=s
testimony does not raise a genuine issue of material fact as to any alleged
benefit-of-the-bargain damage theory.





[7]  In the trial
court, the Investors cited other conversion cases.  See De Shazo v. Wool Growers Central
Storage Co., 162 S.W.2d 401, 404 (Tex. 1942) (holding in a wrongful
conversion of wool, the measure of damages is the highest market value of such
property between the dates of conversion and the filing of the suit); Patterson
v. Wizowaty, 505 S.W.2d 425, 427 (Tex. Civ. App.CHouston [14th Dist.] 1974, no writ) (finding that the
appropriate measure of damages in a fraudulent stock conversion suit is the
highest market value between the date of the conversion and the filing of the
suit).





[8]  The Texas
Securities Act provides a specific civil liability for those who fraudulently
sell securities.  See Tex. Rev. Civ. Stat. Ann. art. 581, ' 33 (Vernon Supp. 2004).  Under this statute, a defrauded party Amay sue either at law or in equity for rescission, or
for damages if the buyer no longer owns the security.@  Id., ' 33(a)(2).  The
damages that a defrauded buyer may recover consist of the consideration paid
for the security plus interest from the date of payment, less the greater of
the value or the actual consideration received from the security when the buyer
disposed of it.  Id. ' 33(d)(3). 





[9]  Although the
Investors also have asserted claims for statutory fraud and negligent
misrepresentation, these fraud-based claims do not expand their potential
recovery of damages or change the above analysis.





[10]  LightPath did
not attack, and we do not address, any essential element of causation or
reliance.  Likewise, we do not base our
opinion on any argument as to the admissibility of the expert testimony of
Meyers or Nicoletti.